Filed 4/24/23 Myers v. California State Board of Equalization CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| MICHAEL D. MYERS, | B307981 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. Nos. BS143436, BS157999, BS158655 |
| v. | |
| CALIFORNIA STATE BOARD OF EQUALIZATION et al., | |
| Defendants and Respondents; | |
| CALIFORNIA PHYSICIANS' SERVICE et al., | |
| Real Parties in Interest and Respondents. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Maren E. Nelson, Judge. Affirmed.

Law Office of Martin N. Buchanan, Martin N. Buchanan; Gianelli & Morris, Timothy J. Morris; Ajalat, Polley, Ayoob, Matarese & Broege, Richard J. Ayoob; Consumer Watchdog,

Jerry Flanagan, Pamela Pressley, and Benjamin Powell for Plaintiff and Appellant.

Kenneth B. Schnoll, Lucy F. Wang, and Harry J. LeVine for Ricardo Lara, Insurance Commissioner of the State of California, as Amicus Curiae on behalf of Plaintiff and Appellant.

Manatt, Phelps & Phillips, Gregory N. Pimstone, Ronald B. Turovsky, and Joanna S. McCallum for Real Party in Interest and Respondent California Physicians' Service dba Blue Shield of California.

Hogan Lovells US, Neal Kumar Katyal, William E. Havemann, Vanessa O. Wells, Michael M. Maddigan, Jordan D. Teti, Katherine B. Wellington, and Nathaniel Zelinsky for Real Party in Interest and Respondent Blue Cross of California dba Anthem Blue Cross.

Morgan, Lewis & Bockius, Thomas M. Peterson, and Molly Moriarty Lane for Real Party in Interest and Respondent Health Net of California, Inc.

Sheppard, Mullin, Richter & Hampton, John T. Brooks, Moe Keshavarzi, and Matthew G. Halgren for Real Party in Interest and Respondent Kaiser Foundation Health Plan, Inc.

Sonia R. Fernandes, Shelia F. Gonzalez, and Johnny A. Colon for California Department of Managed Health Care as Amicus Curiae on behalf of Real Parties in Interest and Respondents.

# INTRODUCTION

These appeals arise out of related taxpayer suits brought by appellant Michael D. Myers under Code of Civil Procedure section 526a. Myers seeks to compel the California State Board of Equalization, the Insurance Commissioner of the State of California, and the Controller of the State of California to collect the gross premium tax (GPT) imposed by article XIII, section 28 of the California Constitution from certain health care service plans (HCSPs), which are regulated by the Department of Managed Health Care (DMHC) under a different regulatory scheme than insurers.

In *Myers v. Board of Equalization* (2015) 240 Cal.App.4th 722 (*Myers I*), a different panel of this Division rejected the argument that the regulatory status of HCSPs determines whether they are subject to the GPT, and adopted a standard for deciding whether HCSPs are insurers for taxation purposes that requires balancing the indemnity aspects of the business against the direct service aspects and determining whether indemnity constitutes a significant financial proportion of the business. Real Parties in Interest and respondents Blue Cross of California dba Anthem Blue Cross (Blue Cross), California Physicians' Service dba Blue Shield of California (Blue Shield), Health Net of California, Inc. (Health Net), and Kaiser Foundation Health Plan, Inc. (Kaiser) (together, Real Parties in Interest) moved for summary judgment, arguing that the undisputed evidence demonstrated that they were not insurers where less than 10 percent of the expenses incurred for medical services under their plans during the relevant periods constituted indemnity under the *Myers I* standard. The trial court agreed and granted summary judgment in their favor.

Myers contends that the trial court incorrectly understood the meaning of indemnity under the *Myers I* standard and that it should have applied a different test to determine whether Real Parties in Interest are insurers. Myers further contends that the court erred in excluding portions of expert declarations and other evidence he submitted in opposition to summary judgment. We conclude that we are bound by the standard adopted in *Myers I*, that the trial court did not err in its application of this standard to the undisputed facts, and that the court did not abuse its discretion in excluding certain evidence submitted by Myers. We therefore affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1. Taxation of Insurers in California

Article XIII, section 28 of the California Constitution imposes a tax of 2.35 percent on the amount of gross premiums received each year by "each insurer doing business in this state." (Cal. Const., art. XIII, § 28, subds. (b), (d).) The Constitution defines "insurers" as including "insurance companies or associations and reciprocal or interinsurance exchanges together with their corporate or other attorneys in fact considered as a single unit, and the State Compensation Insurance Fund." *(Id.,* subd. (a).)[1]

The GPT is imposed on insurers "in lieu of all other taxes and licenses, state, county, and municipal, upon such insurers

---

[1] Article XIII, section 28 was preceded by former article XIII, chapter 14 of the Constitution, which was adopted in 1910 and provided that "[e]very insurance company or association doing business in this state" would be subject to an exclusive GPT.

4

and their property," with limited exceptions. (Cal. Const., art. XIII, § 28, subd. (f); see also *Mutual Life Ins. Co. v. City of Los Angeles* (1990) 50 Cal.3d 402, 408 (*Mutual Life Ins. Co.*).) All other businesses, except for banks and financial corporations, are subject to a corporate franchise tax which is calculated on the basis of the business's net income. (Rev. & Tax. Code, § 23151, subds. (a), (f).)

According to a July 2008 report by the Legislative Analyst's Office, " '[t]he economics of the insurance industry is a key reason for the special treatment of insurance companies' with respect to taxation in California. The report explains the rationale as follows: 'Most [corporate franchise tax] taxpayers calculate their income by subtracting costs incurred in the production of a good or service from the revenues received from their sale. Insurance companies, by contrast, collect their revenues up front [in the form of premiums], then make payments to policyholders based on contingent events that occur many months or years later. Thus, it can be difficult to "match up" revenues to related expenses. In an income tax framework, insurers ideally would be allowed to deduct the current value of all future obligations (claims) covered by the insurance policies they have written when calculating their taxable income for a given year. [However,] [b]ecause the actual amount of these obligations is uncertain, as are the amount of investment earnings on accumulated premiums received during the intervening period, an accurate determination of the theoretically appropriate amount of taxable income proves very difficult to achieve in practice.' 'For this reason,' the Legislative Analyst's Office report concludes, 'a [gross] premiums tax was adopted.' " (*Myers I*, *supra*, 240

Cal.App.4th at p. 736, quoting Legis. Analyst, Investment Income and the Insurance Gross Premiums Tax (July 2008) p. 3.)

## 2. Legislation and Case Law Concerning the Oversight and Taxation of HCSPs

### 2.1. The Origins of HCSPs in California

In 1939, the Legislature passed a bill creating section 593a of the Civil Code, which authorized the formation of health service corporations. (*California Physicians' Service v. Garrison* (1946) 28 Cal.2d 790, 792–793, 802, fn. 1 (*Garrison*).)

In *Garrison*, *supra*, 28 Cal.2d 790, the Supreme Court held that California Physicians' Service (CPS), which served as an agent to secure medical care for low-income individuals in exchange for the payment of monthly membership dues through an employer or professional organization, was not engaged in the business of insurance under California law. CPS's contract with employers and professional organizations provided that the amounts paid by the employers or professional group "are accepted by [CPS] and its professional members as full payment and compensation for all medical and surgical services rendered during the immediately preceding dues period, and they and each of them agree to perform the services herein included, without other, further or additional charge of any kind whatsoever to those beneficiary members . . . ." (*Id.* at p. 796.) The Insurance Commissioner argued that section 593a was invalid, that "[a]ll of the elements of insurance are present in [CPS's] plan," and that "[t]here is no real distinction between service and insurance, and by its contracts the corporation has obligated itself to furnish medical care." (*Id.* at pp. 798–799.) CPS argued that it was "not engaged in the insurance business but is rendering personal

service, as distinguished from indemnity, compensation for which is limited to the resources of a pooled fund; that the professional members, not the Service, assume any and all risk; and that it is actually a producer-consumer cooperative." (*Id.* at p. 799.)

The Supreme Court observed that "it is a matter of common knowledge that there is great social need for adequate medical benefits at a cost which the average wage earner can afford to pay," and that "the Legislature, by enacting section 593a of the Civil Code, expressly authorized the organization of corporations such as [CPS]. By this enactment, the state's social policy in regard to the corporate practice of medicine, to the limited extent specified, has been determined and the courts are bound thereby." (*Garrison, supra*, 28 Cal.2d at pp. 801–802, fn. omitted.) The court stated that " '[t]he question of classification is generally one for the legislative power, to be determined by it in the light of its knowledge of all the circumstances and requirements, and its discretion will not be overthrown unless it is palpably arbitrary. [Citation.]' " (*Id.* at p. 802.) It further observed that "the Legislature has defined insurance as 'a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event' (Ins. Code, § 22; Civ. Code, § 2527[]))," and " 'insurance generally may be defined as an agreement by which one person for a consideration promises to pay money or its equivalent, or to perform some act of value, to another on the destruction, death, loss, or injury of someone or something by specified perils.' [Citation.]" (*Id.* at pp. 803–804.) The court concluded that CPS was not an insurer because it did not assume risk; rather, because the physicians received pro rata payments per member, "the amount of compensation of the professional members is variable and may be

high or low, depending upon the incidence of sickness and the number of beneficiary members paying dues. Stated in terms of insurance, all risk is assumed by the physicians, not by the corporation." (*Id.* at pp. 804–805.)

The court stated that a further, "more compelling reason for holding that the Service is not engaged in the insurance business" was that "[a]bsence or presence of assumption of risk or peril is not the sole test to be applied in determining its status. The question, more broadly, is whether looking at the plan of operation as a whole, 'service' rather than 'indemnity' is its principal object and purpose. [Citations.]" (*Garrison, supra*, 28 Cal.2d at p. 809.) The *Garrison* court explained that the objects and purposes of CPS "have a wide scope in the field of social service." (*Ibid.*) It therefore concluded that CPS was not engaged in the business of insurance within the meaning of the regulatory statutes. (*Id.* at p. 811.)

### 2.2. The Knox-Mills Plan Act

In 1965, the Legislature enacted the Knox-Mills Plan Act (Knox-Mills Act), which specifically governed health plans. Under the Knox-Mills Act, health plans were required to register with the Attorney General and to meet minimum tangible net equity requirements. In addition, the Attorney General was empowered to enforce prohibitions against fraudulent advertising. (Sen. Com. on Health and Welfare, Analysis of Assem. Bill No. 138 (Knox) (1975–1976 Reg. Sess.) as amended June 27, 1975, p. 1.)

In *People ex rel. Roddis v. California Mut. Assn.* (1968) 68 Cal.2d 677, 679 (*Roddis*), the Supreme Court considered whether California Mutual Association (CMA) was an insurer subject to the supervision of the Insurance Commissioner or an HCSP pursuant to the Knox-Mills Act and thus subject to the

supervision of the Attorney General. CMA's stated purpose was to make payments in limited amounts for medical and hospital services rendered to its members using funds derived from periodic dues. (*Id*. at p. 678.) At the start of trial, CMA had contracts with 17 physicians who agreed to render services to members and to look exclusively to CMA for the payment of the scheduled fee. (*Id*. at pp. 678–679.) It was also stipulated that a majority of CMA's members were treated by physicians affiliated with the San Bernardino Foundation for Medical Care and the Riverside Foundation. (*Id*. at p. 679.) CMA did not have contracts with the individual affiliated doctors at either foundation. (*Ibid*.) By the end of trial, CMA had terminated its contract with the San Bernardino foundation and had contracted with 38 physicians who agreed to render services to CMA's members and to look exclusively to CMA for payment of the scheduled fee. (*Ibid*.) CMA also had about seven physicians who agreed to serve members but did not restrict themselves as to the source of payment. (*Ibid*.) CMA encouraged its members to use the services of physicians with whom it had contracts, but also paid the bills of physicians independently chosen by a member in areas where it did not have contracts for medical services. (*Ibid*.)

The Supreme Court observed that the Knox-Mills Act "permits a health care service plan to 'reimburse' a member and thus indicates that service plans may include some indemnity features" but also excludes " 'insurer' from the definition of a 'health care service plan[,]' " thus "evinc[ing] an intention to limit the extent of indemnity features permissible." (*Roddis*, *supra*, 68 Cal.2d at p. 681.) It fell to the court to determine the limit of indemnity features permissible for an HCSP. (*Ibid*.) The court, citing *Garrison*, observed that there are two policy considerations

9

that must be considered in determining the nature of a plan: "Where indemnity features are present, the member bears the risk of personal liability for medical services. This is the insurance risk which can be protected against by financial reserves to assure that the member will receive the benefits for which he has paid. On the other hand, there is a strong social policy to encourage the services which health plans provide the public." (*Id*. at p. 682.) The court concluded "that where indemnity is a significant financial proportion of the business, the organization must be classified as an 'insurer' for the purposes of the Knox-Mills Plan Act." (*Id*. at p. 683.) "[T]his determination involves balancing the indemnity aspects against the direct service aspects of the business, but only in the context of the plan as a whole can it be determined whether the indemnity feature is so significant as to warrant imposing the Insurance Code financial reserve requirements." (*Ibid*.)

The court observed that "[a]lthough CMA's contracts with the 38 physicians provide for direct service without indemnity, the remainder of the plan is one of insurance[,]" as members were liable for services procured from the Riverside foundation, from the seven physicians who did not limit themselves exclusively to payments from CMA, and from physicians with whom CMA did not have contracts. (*Roddis, supra*, 68 Cal.2d at p. 683.) The court observed that it was unclear from the record "what proportion of CMA's members is treated by the 38 physicians" and thus "to what extent indemnity features are still present" and therefore instructed the court on retrial "to determine as of that time in accordance with the views expressed in this opinion the status of CMA as a health care service plan or as an insurer." (*Id*. at pp. 683–684.)

10

### 2.3. The Knox-Keene Health Care Service Plan Act of 1975

The Knox-Mills Act was repealed in 1975, effective July 1, 1976. (Stats. 1975, ch. 941, § 1, p. 2070.) In 1975, the Legislature adopted the Knox-Keene Health Care Service Plan Act of 1975 (Knox-Keene Act) with the express intent and purpose to "promote the delivery and the quality of health and medical care to the people of the State of California who enroll in, or subscribe for the services rendered by, a [HCSP] by accomplishing all of the following: [¶] (a) Ensuring the continued role of the professional as the determiner of the patient's health needs. . . . [¶] (b) Ensuring that subscribers and enrollees are educated and informed of the benefits and services available. . . . [¶] (c) Prosecuting malefactors who make fraudulent solicitations or who use deceptive methods. . . . [¶] (d) Helping to ensure the best possible health care for the public at the lowest possible cost by transferring the financial risk of health care from patients to providers. [¶] (e) Promoting effective representation of the interests of subscribers and enrollees. [¶] (f) Ensuring the financial stability thereof by means of proper regulatory procedures. [¶] (g) Ensuring that subscribers and enrollees receive available and accessible health and medical services rendered in a manner providing continuity of care. [¶] (h) Ensuring that subscribers and enrollees have their grievances expeditiously and thoroughly reviewed by the [DMHC]." (Health & Saf. Code, § 1342.)

In relevant part, the Knox-Keene Act defines HCSPs that are subject to the law's regulations as "[a]ny person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of

11

the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees." (Health & Saf. Code, § 1345, subd. (f)(1).)[2] HCSPs as defined in and regulated by the Knox-Keene Act are under the jurisdiction of the DMHC. (*Id.*, § 1341.) Though such entities are authorized to provide direct payment or reimbursement coverage for their enrollees' medical expenses, HCSPs are statutorily exempted from the Department of Insurance's jurisdiction and are not subject to the Insurance Code's regulations. (Ins. Code, § 740, subd. (g).) This exemption extends to HCSPs offering fee-for-service coverage through a preferred provider organization plan. (*Id.*, § 742, subd. (a).)

Under the Knox-Keene Act, HCSPs must "establish and maintain provider networks, policies, procedures, and quality assurance monitoring systems and processes sufficient to ensure compliance with this clinical appropriateness standard." (Health & Saf. Code, § 1367.03, subd. (a)(1).) They must also ensure a legally prescribed ratio of members to primary care physicians (*id.*, § 1375.9; Cal. Code Regs., tit. 28, § 1300.51, subd. (d)(H)(i)) and comply with requirements concerning the timely availability of appointments. (Cal. Code Regs., tit. 28, § 1300.67.2.2, subd. (c).) HCSPs must also establish procedures to "continuously

---

[2] Originally, the Knox-Keene Act defined an HCSP as "any person who undertakes to arrange for the provision of health care services, to subscribers or enrollees, or to pay for or reimburse any part of the cost for such services in return for a prepaid or periodic charge paid by or on behalf of such subscribers or enrollees, *and who does not substantially indemnify subscribers or enrollees for the cost of provided services.*" (Former Health & Saf. Code, § 1345, subd. (f), italics added.) In 1980, the Legislature removed the reference to indemnity from the definition. (Stats. 1980, ch. 628, § 2, p. 1716.)

review[] the quality of care, performance of medical personnel, utilization of services and facilities, and costs" (Health & Saf. Code, § 1370) and must establish and maintain a system, approved by DMHC, that allows members to submit their grievances to the plan. (*Id.*, § 1368, subd. (a); Cal. Code Regs., tit. 28, § 1300.68.)

Because HCSPs include, by definition, entities that agree to "pay for or to reimburse" enrollees for the cost of medical services in exchange for a "prepaid or periodic charge" (Health & Saf. Code, § 1345, subd. (f)(1)), the Knox-Keene Act includes capitalization requirements and vests financial oversight authority in the DMHC. (*Id.,* §§ 1376, 1377, 1399, subd. (c).) California law further requires that every contract between a plan and a health care services provider must state that "the subscriber or enrollee shall not be liable to the provider for any sums owed by the plan." (*Id.*, § 1379, subd. (a).) Moreover, even if the contract fails to include this provision, the statute provides that "the contracting provider shall not collect or attempt to collect from the subscriber or enrollee sums owed by the plan." (*Id.*, subd. (b).) Thus, "[t]he clear import of section 1379 is to protect *patients* with health care service plan coverage from any collection attempts by providers of such medical care as emergency room services." (*Dameron Hospital Assn. v. AAA Northern California, Nevada & Utah Ins. Exchange* (2014) 229 Cal.App.4th 549, 563.)

### 2.4. Recent Legislation Concerning the Taxation of HCSPs

In 2016, new legislation—Senate Bill No. X2-2—was enacted in response to positions taken by the federal government regarding the conditions necessary to receive federal monies

funding the Medi-Cal program. The purpose of Senate Bill No. X2-2 was to "[r]eform[] the existing managed care organization (MCO) provider tax that is only paid by Medi-Cal managed care plans (MCPs) and replace[] it with a tax that would be assessed on health care service plans licensed by the [DMHC], and/or managed care plans contracted with the Department of Health Care Services (DHCS) to provide services to Medi-Cal beneficiaries, unless exempted, from July 1, 2016 to July 1, 2019." (Sen. Bill No. X2-2, Proposed Conference Report No. 1, Feb. 22, 2016, p. 1.) The bill thus imposed an MCO tax on many HCSPs for the first time. Some health plans, including those of some of the Real Parties in Interest, also operate an admitted health insurer. As to those entities, the new statute temporarily reduced the GPT to 0 percent. (Stats. 2015–2016, 2nd Ex. Sess., ch. 2, p. 6030.)

Assembly Bill No. 115, which became effective July 1, 2019, "establish[ed] a managed care organization provider tax, with substantially similar provisions [to the 2016 MCO tax], that would become effective and operative on the effective date of the federal approval necessary for receipt of federal financial participation, as specified[]" and "specif[ied] the applicable tax amounts for each taxing tier for the 2019–20, 2020–21, and 2021–22, fiscal years, and the first 6 months of the 2022–23 fiscal year." (Stats. 2019–2020, ch. 348, p. 3232.) This bill, like the prior MCO tax, was intended to comply with federal requirements that allow states to receive "federal financial participation for expenditures using health care-related taxes, as long as the taxes are broad-based, uniformly imposed, and contain no hold-harmless provision." (Sen. Rules Com., Off. of Sen. Floor

Analyses, 3d reading analysis of Assem. Bill No. 115 (2019–2020 Reg. Sess.) as amended Aug. 29, 2019, p. 1.)

## 3. Real Parties in Interest

### 3.1. Blue Cross

In the mid-to-late 1980's, Blue Cross operated as a nonprofit hospital service plan and was facing financial difficulties. To address Blue Cross's dire situation, to help ensure its survival, and to prevent adverse impacts on consumers and the California health benefits market, the Legislature enacted Senate Bill No. 785. (Stats. 1990, ch. 1043.) Senate Bill No. 785 essentially required Blue Cross to transition from being a nonprofit hospital service plan under Chapter 11A of the Insurance Code to being a health care service plan regulated by the Department of Corporations (DOC) under the Knox-Keene Health Care Service Plan Act. Blue Cross undertook a number of changes required by the DOC and is now a Knox-Keene Act-licensed HCSP regulated by the DMHC.[3]

Blue Cross offers its members access to health maintenance organization (HMO) and preferred provider organization (PPO) health plans. Under HMO and PPO plans, members have access to a network of medical providers, hospitals, and other facilities that have contracted with Blue Cross to provide medical services to Blue Cross members at agreed upon rates. For Blue Cross's commercial HMO and PPO plans, groups and members pay Blue Cross a fixed periodic fee for coverage, called the "premium," which does not change during the coverage period based on the

---

[3] The regulation of HCSPs has transferred from the DOC to the DMHC.

15

amount of medical services a member uses. Under Blue Cross's HMO and PPO plans, the member also may be responsible for a portion of the costs of the medical care they receive, generally in the form of deductibles,[4] copayments (or "co-pays"),[5] or coinsurance,[6] which are sometimes called the "cost share."

For both HMO and PPO plans, Blue Cross's in-network providers have agreed to accept Blue Cross's payment at the rate agreed upon in their contract with Blue Cross as payment-in-full for the covered services they render to Blue Cross members. Blue Cross's in-network providers are contractually prohibited from billing Blue Cross members for any difference between their contractually agreed upon rate and their usual charges for the covered services they provide to Blue Cross members (a practice known as "balance billing"). For the years 2005 through 2016, Blue Cross's HMO and PPO plans have included the following (or

---

[4] A deductible is an amount that a particular plan may require the member to pay before Blue Cross has any obligation to cover medical services for that member (e.g., if the plan has a $500 annual deductible, the member must pay the first $500 of medical services she receives during the coverage year, and Blue Cross would not cover the first $500 in medical services). Blue Shield's, Kaiser's, and Health Net's member contracts contain substantially similar definitions.

[5] A copayment is an amount the member pays directly to the medical provider at the time medical services are rendered, and this amount is not covered by Blue Cross. Blue Shield's, Kaiser's, and Health Net's member contracts contain substantially similar definitions.

[6] A plan may require the member to pay a portion of the amount Blue Cross has negotiated as the price for a particular service, which is sometimes called "coinsurance" (e.g., a plan may require Blue Cross to pay 80 percent of the allowed amount for any covered services, while the member is obligated to pay 20 percent of the cost of those services). Kaiser's member contract contains a substantially similar definition.

substantially similar) language: "In accordance with California law, Members will not be required to pay any Participating Provider for amounts owed to that provider by Anthem (other than Copayment/Coinsurance and Deductibles) even in the unlikely event that Anthem fails to pay the provider. Members are liable, however, to pay Non-Participating Providers for any amounts not paid to them by Anthem."

For the years 2005 through 2016, Blue Cross's agreements with participating physicians, hospitals, and medical facilities stated that, except for copayments, coinsurance, and deductible amounts required by the applicable agreement, the physicians, hospitals, and medical facilities would not invoice or balance bill a member for any difference between the billed charges and the reimbursement paid by Blue Cross for services provided to the member. For the same period, Blue Cross's agreements with participating physician associations and medical groups required that the physician association or medical group accept a monthly capitation payment from Blue Cross as payment in full for services provided or arranged and not to invoice, balance bill or otherwise seek payments or compensation from members for "Covered Medical Services." Similarly, Blue Cross's agreements with participating hospitals and medical facilities during that period included language stating that the hospital or facility would look solely to Blue Cross for payment, subject to limited exceptions, and cannot seek compensation from any member.

Blue Cross's PPO plans between 2005 and 2016 included language generally providing that, for covered out-of-network services, Blue Cross would cover (i) an amount that is "customary and reasonable" for medical providers in the same geographical area to accept for such services, (ii) an amount determined with

reference to a separate payment schedule (e.g., the Medicare fee schedule), (iii) an amount based on the provider's billed charges, or (iv) a specifically negotiated amount. For the same period, Blue Cross's PPO plans have included the following language, or substantially similar language: "When you use an Out-of-Network Provider, You may have to pay the difference between the Out-of-Network Provider's billed charge and the Maximum Allowed Amount in addition to any Coinsurance, Copayments, Deductibles and non-covered charges. This amount can be substantial." Blue Cross's PPO plans generally cover a lower percentage of the covered amount for out-of-network services than the percentage they cover for in-network services.

The annual percentage of Blue Cross's reported in-network medical expenses as compared to its total medical expenses for its commercial plans for the years 2005 to 2016, as reported by Blue Cross to the DMHC, ranged from approximately 92.1 percent to 96.8 percent. During that period, Blue Cross reported aggregate expenses for out-of-network claims that were 5.8 percent of its total claims expenses, and aggregate expenses for in-network claims that were 94.2 percent of its total claims expenses.

Between 2005 and 2016, Blue Cross paid between approximately 87.7 percent and 90.4 percent of claims expenses incurred for medical services provided to its members within the same calendar year as the year the services were rendered. For each year during this period, Blue Cross paid over 99 percent of claims expenses incurred for medical services provided to its members by the end of August the following year.

### 3.2. Blue Shield

Blue Shield is an HCSP regulated by the DMHC under the Knox-Keene Act. Blue Shield arranges and pays for medical care

18

to its members through a variety of managed health care products, including HMO and PPO plans. In addition to paying and processing member claims, Blue Shield engages in the provision of other health care services to its members and spends more than $100 million annually on service functions other than processing and paying claims. Examples include developing and maintaining networks of health care providers, credentialing contracted providers, reviewing quality of care and performance of medical personnel, and ensuring appropriate referrals to specialists.

Blue Shield contracts with providers who agree in advance to render services to Blue Shield PPO and HMO plan members at contracted rates and not to seek payment from the members, other than contractually required member cost share amounts (i.e., deductibles, copayments, and coinsurance). Blue Shield's HMO and PPO contracts with members also reflect the prohibition on member financial liability to contracted providers. Some non-contracted providers are also prohibited from attempting to collect from plan members, including non-contracted providers of emergency services, non-contracted providers who provide services authorized by the plan that cannot be rendered in-network, and continuity of care services when a contracted provider becomes a non-contracted provider.

In the case of HMO plans, members must use contracted providers for nearly all care for that care to be covered under the plan. HMO members are required to choose an in-network primary care physician upon enrollment, and the primary care physician is responsible for coordinating the medical services provided to the HMO member. Services from non-contracted providers are not covered for HMO members except in limited

circumstances, such as emergencies and instances where a service or specialist is not available within the contracted network. HMO members typically are responsible for only a deductible and/or a copayment for services obtained within their network, and Blue Shield or the contracted medical group is responsible for the remainder.

PPOs offer medical care through a network of providers who have contracted with Blue Shield to provide services at predetermined rates. Although PPO members, unlike HMO members, may choose to obtain services from non-contracted (out-of-network) providers, PPO plans incentivize the use of contracted providers by setting lower member deductibles, copayments, and/or coinsurance rates for services from contracted providers, and protecting members from the difference between what Blue Shield pays and the balance of the contracted providers' billed rates. PPO members may also be responsible for deductibles, copayments, or coinsurance.

Between 2005 and June 2016, Blue Shield's expenditures to contracted providers, as reported to the DMHC on quarterly and year-end financial statements, ranged from 94 percent to 97 percent, averaging 96 percent, and expenditures to non-contracted providers averaged 4 percent.

### 3.3. Kaiser

Kaiser is an HCSP licensed under the Knox-Keene Act and regulated by the DMHC. Kaiser provides medical and hospital services to its members through a nonprofit organization, Kaiser Foundation Hospitals, Inc. (KFH), and two medical groups, The Permanente Medical Group, Inc. and Southern California Permanente Medical Group (together, the Permanente Medical Groups). Collectively, these separate legal entities operate under

the trade name "Kaiser Permanente." KFH and the Permanente Medical Groups employ tens of thousands of physicians and nurses and operate dozens of hospitals and hundreds of other medical facilities. Kaiser contracts with KFH to directly provide hospital facilities and related hospital services to Kaiser's members. KFH owns all the Kaiser hospitals in California, and Kaiser and KFH own or lease all the medical offices used by Kaiser Permanente clinicians to provide care to Kaiser members in California. To the extent community hospital and related services are needed to supplement Kaiser's hospital services, KFH arranges with community hospitals and providers for such services. Kaiser and KFH are separate corporations but are historically and operationally intertwined, with overlapping boards of directors and top executives in common.

There are two Hospital Services Agreements between Kaiser and KFH, one applicable to its Northern California service area and one applicable to its Southern California service area. The Permanente Medical Groups are responsible for directly providing or arranging all the professional medical services that Kaiser's California members are entitled to under their membership agreement with Kaiser. The Permanente Medical Groups do not contract to provide care to members of other health care service plans and do not contract with indemnity health insurers. Since 1990, Kaiser's contracts with the Southern California Permanente Medical Group have contained exclusivity provisions, and from 2006 to 2016, Kaiser's contracts with The Permanente Medical Group, Inc. have contained exclusivity provisions.

Kaiser and KFH report their financial results on a combined basis. Until 2016, Kaiser directly reimbursed KFH's

net operating expenses as the primary form of compensation for the provision of hospital services to Kaiser members. In addition, Kaiser and KFH shared a portion of any combined annual net operating revenue gain or loss in proportion to the parties' respective share of financed assets. Beginning in 2016, the payment structure was modified in part so that, in addition to continuing to reimburse certain expenses of KFH, Kaiser began to also pay KFH using a combination of per capita and other payments.

Kaiser does not sell contracts that allow members to seek covered health care services from any provider or hospital of their choice, nor does Kaiser, with limited exceptions, promise to reimburse members for care they receive outside of Kaiser Permanente. Every Kaiser Evidence of Coverage document (EOC) issued in California between 2005 and 2016 contained the following (or substantially similar) language: "Kaiser Permanente provides Services directly to our Members through an integrated medical care program. Health Plan, Plan Hospitals, and the Medical Group work together to provide our Members with quality care. Our medical care program gives you access to all of the covered Services you may need, such as routine care with your own personal Plan Physician, hospital care, laboratory and pharmacy Services, Emergency Services, Urgent Care, and other benefits described in this Evidence of Coverage. Plus, our health education programs offer you great ways to protect and improve health." Further, every Kaiser EOC sold in California between 2005 and 2016 states: "As a Member, you are selecting our medical care program to provide your health care. You must receive all covered care from Plan Providers inside our Service Area, except as described in the sections below for the following

Services[,]" including " 'authorized referrals,' 'emergency ambulance Services,' 'Emergency Services, Post -Stabilization Care, and Out-of-Area Urgent Care,' and 'Hospice Care.' " Every Kaiser EOC sold in California between 2005 and 2016 also stated: "Our contracts with Plan Providers provide that you are not liable for any amounts we owe." However, Kaiser members are responsible for copayment, coinsurance, and deductible amounts when they seek medical care from KFH and the Permanente Medical Groups.

The EOCs sold in California between 2005 and 2016 further stated: "If you receive Emergency Services, Post-Stabilization Care, or Out-of-Area Urgent Care from a Non-Plan Provider as described in this 'Emergency Services and Urgent Care' section, or emergency ambulance Services described under 'Ambulance Services' in the 'Benefits and Your Cost Share' section, you are not responsible for any amounts beyond your Cost Share for covered Emergency Services. However, if the provider does not agree to bill us, you may have to pay for the Services and file a claim for reimbursement. Also, you may be required to pay and file a claim for any Services prescribed by a Non-Plan Provider as part of covered Emergency Services, Post-Stabilization Care, and Out-of-Area Urgent Care even if you receive the services from a Plan Provider, such as a Plan Pharmacy."

Every Kaiser EOC in California between 2005 and 2016 required the member or their employer to prepay premiums on a periodic basis. Thus, at the time that a service was rendered, the member's financial responsibility for covered services was limited to the member's cost share (including copayments).

The relevant contracts between Kaiser and The Permanente Medical Group, Inc., Southern California Permanente Medical Group and KFH, respectively, have member non-liability provisions, as do Kaiser's contracts with providers outside of Kaiser Permanente.

Between 2007 and 2016, measured by dollars, approximately 1 to 4 percent of Kaiser's healthcare expenses were paid to noncontracting providers or directly reimbursed to members. The portion of expenses consisting of payments to non-contracted providers or reimbursements to members mainly consists of situations in which Kaiser has no control over what provider a member visits, such as emergency room treatment which Kaiser is required by law to cover regardless of whether it is contracted with the emergency provider.

For the years 2007 through 2014, measured by discrete visits or consultations, approximately 95 percent of the covered health services provided to Kaiser members were rendered by Kaiser Permanente providers (i.e., Kaiser Foundation Hospitals, Inc., The Permanente Medical Group, Inc., and the Southern California Permanente Medical Group). In 2015, measured by discrete visits or consultations, approximately 93.3 percent of the covered health services provided to Kaiser members were rendered by Kaiser Permanente providers, while only approximately 6.7 percent of services were rendered by contracted or non-contracted providers outside Kaiser Permanente. In 2016, measured by discrete visits or consultations, approximately 94.7 percent of the covered health services provided to Kaiser members were rendered by Kaiser Permanente providers, while only approximately 5.3 percent of

24

services were rendered by contracted or non-contracted providers outside Kaiser Permanente.

Kaiser's contracts with the Permanente Medical Groups provide for compensation to be paid largely on a prepayment basis, in which the amount of compensation is determined in advance (based on factors such as number of members) and not based on the amount of services actually provided to members. The principal form of such prepayment is capitation. Kaiser's contracts with the Permanente Medical Groups each require Kaiser to make per capita (capitated)[7] payments based on the number of members served by the medical group, regardless how many members actually seek services during a given period and regardless of the amount of services used by the members. Capitated payments thus represent a substantial majority of the payments made by Kaiser to the two medical groups.

### 3.4. Health Net

Health Net is a Knox-Keene Act licensed HCSP. Health Net offers access to HMO plans to its members, as well as Point of Service, Medicare, and Medi-Cal plans. ) Health Net does not offer PPO plans or traditional health and accident insurance plans to its members.

---

[7] " ' "[C]apitated basis" ' is defined by regulation to mean 'fixed per member per month payment or percentage of premium payment wherein the provider assumes the full risk for the cost of contracted services without regard to the type, value or frequency of services provided.' " (*Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1004, fn. 8, quoting Cal. Code Regs., tit. 28, § 1300.76, subd. (d).) In contrast, non-capitated payments include fee-for-service payments.

When enrolled in Health Net's commercial HMO plans, members (or their employers) pay a fixed periodic fee for coverage. A Health Net commercial HMO member may be responsible for cost-share responsibilities, such as copayments, coinsurance, and deductibles, when they obtain medical services. Health Net sets its premiums based on the anticipated aggregate cost of providing future medical and hospital care to members, which it estimates by predicting future costs of providing medical care based on past claims "experience" and anticipated changes in the health care needs of new membership, changes in benefits, the introduction of new medical treatments, and prescription drug inflation among other factors.

When members initially enroll in a Health Net commercial HMO plan, they are required to choose an in-network primary care physician. Health Net's contracted primary care physicians (in some instances, along with a designated physician group) coordinate medical services provided to commercial HMO members and assist members with securing their medical care, including preventative care and specialist referrals.

Sample Evidence of Coverage documents for Health Net's commercial HMO plans issued in California during the 2007 through 2016 period contain the following (or substantially similar) language: "When you enroll in this Plan, you must select a contracting Physician Group where you want to receive all of your medical care. That Physician Group will provide or authorize all medical care." Sample Evidence of Coverage documents for Health Net's commercial HMO plans issued in California during the 2007 through 2016 period contain the following (or substantially similar) language: "Your Physician Group will authorize and coordinate all your care, providing you

with medical services or supplies. You are financially responsible for any required Copayment . . . . However, you are completely financially responsible for medical care that the Physician Group does not provide or authorize except for Medically Necessary care provided in a legitimate emergency. You are also financially responsible for care that this Plan does not cover."

Health Net's commercial HMO provider contracts with in-network providers between 2007 and 2016 contain the following (or substantially similar) language: "Provider agrees that in no event shall Provider bill, charge, collect a deposit from, seek compensation, remuneration, or reimbursement from, or have any recourse against Beneficiaries or persons acting on their behalf other than Health Net or a Payor for Contracted Services provided pursuant to this Agreement except for Copayments, Coinsurance, Deductibles, Excluded Services or permitted third party liens." Health Net compensates health care providers on both a capitated and fee-for-service basis.

Health Net maintains a network of providers for its HMO members, which includes approximately 264 California facilities and 59,000 California professional providers for Health Net's broadest commercial HMO network. Out-of-network care is restricted within Health Net's commercial HMOs. Sample Evidence of Coverage documents for Health Net's commercial HMO plans issued in California during the 2007 through 2016 period contain the following (or substantially similar) language: "Except in an emergency or other urgent medical circumstances, the covered services of this plan must be performed by your Physician Group or authorized by them to be performed by others. You may use other providers outside your Physician Group only when you are referred to them by your Physician

Group." Health Net or a designated physician group, and not commercial HMO members, are responsible for paying all covered out-of-network services rendered to commercial HMO members.

The annual approximate percentage of Health Net's reported in-network expenses as compared to its total medical expenses for all Health Net product lines for the years 2007 to 2016 as reported by Health Net to the DMHC was between 96 percent to 99 percent. In the combined period of 2007 through 2016, approximately 98.6 percent of Health Net's reported health care expenses were made to in-network providers as defined by the DMHC.[8]

## 4. Procedural Background

In 2013, Myers filed this taxpayer action under Code of Civil Procedure section 526a against the State Board of Equalization, the Insurance Commissioner, and the State Controller (collectively, the State Defendants), to compel the State Defendants to assess and collect the GPT against Blue Cross and Blue Shield. Myers alleged that Blue Cross and Blue Shield are among the largest health "insurers" in this state by virtue of the significant premiums they collect in exchange for agreeing to indemnify their enrollees against contingent medical expenses, largely through preferred provider organization plans. Myers further alleged that Blue Cross and Blue Shield have not

---

[8] Myers disputed these facts before the trial court. The court concluded that no material dispute existed because Myers did not identify any errors or issues with the data relied upon for these conclusions, but instead relied on deposition testimony concerning another issue and based on different data. We agree that no material dispute of fact exists as to these percentages, a point that is not contested on appeal.

paid the gross premium tax that is paid by other companies that issue similar fee-for-service indemnity health insurance contracts. He therefore sought mandamus requiring the State Defendants to assess and collect back GPT payments for the preceding eight years, during which the State Controller had not directed the collection of the GPT from Blue Cross or Blue Shield.

The trial court sustained demurrers filed by Blue Cross and Blue Shield, both on res judicata grounds[9] and because Blue Cross's and Blue Shield's status as HCSPs meant that they were not subject to the statutes regulating insurers and that they were therefore not "insurers" for GPT purposes. A panel of this Division reversed the judgment and vacated the order sustaining the demurrers. (*Myers I*, *supra*, 240 Cal.App.4th at p. 745.) As discussed in greater detail *infra*, the court in *Myers I* rejected the argument that Blue Cross and Blue Shield were not insurers for GPT purposes because they are regulated as HCSPs and held that the applicable standard was set forth in *Roddis*: a court must " 'balanc[e] the indemnity aspects against the direct service aspects of the business' " and determine whether " 'indemnity is a significant financial proportion of the business,' " in which case it is an insurer. (*Id.*, at p. 740.) Applying the *Roddis* standard to the allegations of the petitions, the court concluded that Myers had

_____

[9] In November 2004, the Foundation for Taxpayer and Consumer Rights (FTCR) petitioned the court to compel the state agencies to collect the GPT from Blue Cross. The central theory in the FTCR case was that Blue Cross must be considered and taxed as an "insurer" since a substantial portion of its plans were PPO products which are in the nature of insurance. The court in the FTCR case ruled against FTCR as a matter of law, holding that (1) FTCR had no standing to bring an action to enjoin or prevent the collection of a tax, and (2) Blue Cross, as an HCSP, is not an "insurer" and the GPT does not apply.

adequately alleged that a significant financial proportion of Blue Cross's and Blue Shield's business was indemnity. (*Id*. at pp. 740–741.) The court further held that the public interest exception to the res judicata doctrine applied. (*Id*. at pp. 742–743.)

In 2015, Myers filed two further actions seeking to compel the State Defendants to assess and collect the GPT against Kaiser and Health Net. Myers once again sought mandamus requiring the State Defendants to assess and collect back GPT payments for the preceding eight years. Both actions were found to be related with the Blue Cross and Blue Shield action and were reassigned to the same judge.

Following the enactment of Senate Bill No. X2-2 in 2016, Myers stipulated that he seeks the collection of the GPT prior to June 30, 2016 and does not seek the collection of the GPT against Real Parties in Interest after June 30, 2016.[10] In 2017, Kaiser and Health Net demurred and Blue Cross and Blue Shield moved for judgment on the pleadings, arguing that the change in law demonstrated that they were not insurers and that *Myers I* was no longer binding. In 2018, the court found that many of the facts urged by the moving parties were not properly subject to judicial notice and therefore denied the motions for judgment on the pleadings and overruled the demurrers. Blue Shield filed a petition seeking writ review of the denial of the motion. A panel of this Division issued an order to show cause why the motion should not be granted. Following briefing, another panel

---

[10] Accordingly, the relevant period for Blue Cross and Blue Shield is 2005 through 2016, and the relevant period for Kaiser and Health Net is 2007 through 2016.

discharged the order, having determined that review of the issues raised in this proceeding should await entry of a final judgment in the trial court.[11]

In 2019 and 2020, Real Parties in Interest moved for summary judgment, arguing that they were not insurers under the *Roddis* standard adopted in *Myers I* because more than 90 percent of their medical expenses during the relevant period were for in-network services, for which members are not personally responsible beyond cost-share payments. In support of these contentions, Real Parties in Interest submitted declarations from executives, advisors, and actuaries, annual reports made to the DMHC, and sample contracts with members and providers, among other evidence.

Myers did not dispute the majority of the evidence relied upon by Real Parties in Interest.[12] However, Myers argued that the correct test for whether Real Parties in Interest are insurers is whether they spread and underwrite a policyholder's risk, and submitted evidence, including policy forms, agreements, actuarial memoranda and certifications, and deposition testimony, to support that Real Parties in Interest engage in risk-shifting and

---

[11] We grant Blue Shield's motion for judicial notice filed February 2, 2022, which sought judicial notice of this order, as well as briefs filed by the Insurance Commissioner of the State of California in the *Myers I* appeal. (Evid. Code, § 452, subd. (d); *Glaski v. Bank of America* (2013) 218 Cal.App.4th 1079, 1090 ["Courts can take judicial notice of the existence, content and authenticity of public records and other specified documents . . . ."].)

[12] In many instances, Myers disputed inferences that might be drawn from facts he did not dispute. The trial court correctly concluded that disputing facts with argument is insufficient to create a dispute of material fact.

held themselves out as insurers. In support of his oppositions, Myers also filed declarations from Ian Duncan, Ph.D., who opined that Real Parties in Interest use actuaries to calculate reserves and premium rates, hold free capital, and effectively operate in the same manner as insurers.

Real Parties in Interest raised evidentiary objections to portions of the Duncan declarations, primarily on relevancy and foundation grounds, and argued that whether Real Parties in Interest assume risk and distribute it among their members, how they set rates and compensate healthcare providers, and their actuarial practices have no bearing on whether they are insurers under the *Roddis* standard. Health Net and Blue Cross further objected to evidence of the payouts they received as insurers under the federal Affordable Care Act. Blue Cross and Blue Shield also objected to evidence that the PPO plans offered by companies affiliated with Blue Cross and Blue Shield are similar to those offered by Blue Cross and Blue Shield and that their websites and actuarial certificates refer to both as insurers, on grounds that such evidence was irrelevant.

In 2020, the trial court granted the summary judgment motions of Real Parties in Interest. The court concluded that the *Roddis* test adopted in *Myers I* controlled and that indemnity under this test means whether the member bears the risk of personal liability for medical services.[13] The court further concluded that, although Real Parties in Interest take on the risk that they will pay for the health care needed for their members, the record demonstrated that Real Parties in Interest were

---

[13] As to Blue Cross and Blue Shield, the court concluded that *Myers I* is law of the case.

largely in the business of providing health care and their model is therefore one primarily of "service" rather than of "indemnity" as those terms are used in *Roddis* and *Myers I*. The court sustained most of the objections Real Parties in Interest made to the Duncan declarations, primarily on relevancy grounds. It also sustained many of the additional objections made by Blue Cross, Blue Shield, and Health Net on relevancy grounds.

Myers timely appealed.

## CONTENTIONS

Myers argues that the trial court incorrectly applied the *Roddis* standard adopted in *Myers I*. His amicus curiae, the Insurance Commissioner, echoes this argument.[14] Myers further contends that the court in *Myers I* held that non-capitated payments constitute indemnity and that Real Parties in Interest are insurers because their payments to healthcare providers are primarily non-capitated. He asserts that this court should follow federal and California cases that have held that HMOs are insurers for purposes of federal preemption law. Myers also argues that the business of Real Parties in Interest implicates the reasoning underlying the adoption of the GPT.

Real Parties in Interest and their amicus, the DMHC, contend that the trial court correctly understood and applied the *Roddis* standard. They argue that Real Parties in Interest are not insurers because it is undisputed that over 90 percent of their respective claims costs during the relevant periods were for in-

---

[14] Although identified as a respondent by Myers, the Insurance Commissioner argues that summary judgment was not sought against him and that he is "not clearly a respondent." He therefore sought and obtained permission to file an amicus curiae brief in support of Myers.

network services, for which members bear no risk of liability. Although Blue Shield and Blue Cross argue that they are not insurers under the standard adopted in *Myers I*, they argue that this court should determine that *Myers I* is no longer the law of the case following the adoption of the 2016 MCO tax, which they contend demonstrates the Legislature's understanding that the GPT does not apply and never has applied to HCSPs. The DMHC similarly contends that the Legislature has never defined or treated HCSPs as insurers. Blue Cross also argues that, if this court concludes that the law of the case doctrine applies and that it is an insurer under the *Myers I* standard, we should not apply *Myers I* retroactively.

## DISCUSSION

### 1. The court correctly granted summary judgment in favor of Real Parties in Interest.

#### 1.1. Standard of Review

" 'In evaluating the propriety of a grant of summary judgment our review is de novo, and we independently review the record before the trial court. [Citation.] In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment. [Citation.]' [Citation.] Section 437c, subdivision (c) provides that a motion for summary judgment shall be granted if all the papers submitted show there is no triable issue as to any material fact such that the moving party is entitled to judgment as a matter of law. [¶] Where the trial court grants summary judgment solely upon the basis of its interpretation of statutory and case law, '[i]t is well settled that the interpretation and application of a statutory scheme to an

34

undisputed set of facts is a question of law [citation] which is subject to de novo review on appeal. [Citation.]' [Citation.] In such a case, the appellate court is not bound by the trial court's interpretation. [Citations.]" (*City of San Diego v. Dunkl* (2001) 86 Cal.App.4th 384, 395.)

### 1.2. *Under Myers I, Roddis* supplies the relevant standard for determining whether Real Parties in Interest are insurers.

The first issue before us is the appropriate law to apply to the undisputed facts to determine whether Real Parties in Interest are insurers for purposes of imposing the GPT tax. The trial court concluded that *Myers I* is law of the case as to Blue Cross and Blue Shield and applied the *Myers I* standard to the motions brought by all Real Parties in Interest. Myers and Real Parties in Interest argue in the first instance that the trial court's decision was error or correct by reference to *Myers I*. Thus, we begin our analysis with an examination of *Myers I* before turning to the parties' competing interpretations of that decision.

#### 1.2.1. *Myers I*

In *Myers I*, a panel of this Division concluded that Myers's petition adequately alleged that Blue Cross and Blue Shield are insurers under the GPT provision in the Constitution. (*Myers I, supra*, 240 Cal.App.4th at p. 737.) The allegations of the complaint focused on Blue Cross's and Blue Shield's PPO plans and alleged that Blue Shield paid over three times for non-capitated medical expenses than for capitated medical expenses and that Blue Shield's fee-for-services payments on behalf of members are five to six times larger than its prepaid capitation payments. (*Id.* at pp. 730–731.) Myers therefore alleged that Blue

35

Cross and Blue Shield "receive a substantial portion of their premiums each year in exchange for agreeing to indemnify their enrollees against a risk of loss occasioned by contingent medical expenses, and in doing so, [Blue Cross's and Blue Shield's] contracts effectively spread the financial risk posed by those contingent medical events among the millions of Californians who pay premiums to enroll in [Blue Cross's and Blue Shield's] plans." (*Id.* at pp. 738–739.) Myers argued that the trial court erred in resolving the "factual issue" of whether Blue Cross and Blue Shield are insurers based on their regulatory status as HCSPs and that the court "should have applied the test set forth in *Roddis* to assess whether the complaint's allegations concerning [Blue Cross's and Blue Shield's] business activities supported the claim that they are "insurers" under the Constitution's gross premium tax." (*Id.* at p. 739.)

The *Myers I* court discussed the taxation of insurance companies under California law and the regulatory regime applicable to HSCPs before turning to relevant case law. The court summarized *Roddis*, including the " 'two policy considerations' " that drove the Supreme Court's analysis: "First, . . . '[w]here indemnity features are present, the member bears the risk of personal liability for medical services. This is the insurance risk which can be protected against by financial reserves to assure that the member will receive the benefits for which he has paid.' [Citation.] As for the second consideration, the court emphasized, 'there is a strong social policy to encourage the services which health plans provide the public,' and the Insurance Code's financial reserve requirements should not inhibit the development of health plans to meet that need. [Citation.]" (*Myers I*, *supra*, 240 Cal.App.4th at p. 740.) The court

then concluded that "*Roddis* provides the appropriate standard for determining whether an entity should be regarded as an 'insurer' for purposes of assessing the gross premium tax under article XIII, section 28 of the Constitution." (*Id.* at pp. 740–741.) It further concluded that the "the critical role that financial solvency concerns played in the Supreme Court's formulation of the *Roddis* test" constituted "a distinction without difference" when it came to assessing whether an entity is an "insurer" under the Constitution's GPT provision. (*Id.* at p. 741.)

The *Myers I* court also cited another Supreme Court decision, *Metropolitan Life Ins. Co. v. State Bd. of Equalization* (1982) 32 Cal.3d 649 (*Metropolitan Life*), for the proposition that "the gross premium tax's purpose is to 'exact payments from insurers doing business in California' by 'approximat[ing] the volume of business done in this state, and thus the extent to which insurers have availed themselves of the privilege of doing business in California[,]' " and that courts must therefore " 'look beyond the formal labels the parties have affixed to their transactions" and instead " 'discern the true economic substance' of the arrangement." (*Myers I*, *supra*, 240 Cal.App.4th at p. 741, quoting *Metropolitan Life*, at p. 656.)

With this background in mind, the *Myers I* court concluded that the mere fact that Blue Cross and Blue Shield were designated HCSPs for regulatory purposes was not determinative. (*Myers I*, *supra*, 240 Cal.App.4th at p. 741.) It observed that "the underlying reason for this state's adoption of the gross premium tax was to simplify the taxation of insurance companies that, in contrast to other businesses, have difficulty calculating their net profits in a given tax year because they collect revenues up front in the form of premiums, then make

37

indemnity payments to policyholders based on contingent events that occur many months or years later." (*Id.* at pp. 741–742.) Because Myers had alleged that "under [Blue Cross's and Blue Shield's] PPO policies they collect premiums up front, but do not make payments on the policies unless and until a contingent medical event occurs" and that "a significant financial portion of their business operations allegedly consist of indemnity contracts, the underlying rationale for applying the gross premium tax to other insurance companies applies equally to Blue Cross and Blue Shield." (*Id.* at p. 742.)

### 1.2.2. The *Roddis* definition of indemnity was not dictum.

Myers contends that the *Myers I* court did not intend to adopt the definition of indemnity set forth in *Roddis*—that is, that indemnity aspects are present where a member bears the risk of personal liability for medical services. He argues that *Roddis*'s definition of indemnity does not apply because it was a case concerning regulatory statutes rather than the GPT, and *Myers I*'s reference to that definition was mere dictum. Relying on *Metropolitan Life*, Myers argues that Blue Cross's and Blue Shield's PPO plans and the HMO plans of all Real Parties in Interest constitute insurance under the California Constitution because their plans involve the shifting and distribution of risk. Real Parties in Interest contend that the *Myers I* court gave no indication that it was adopting the *Roddis* standard but not its definition of indemnity, nor did it suggest that *Metropolitan Life*'s discussion of the elements of insurance supplied the relevant definition. We agree with Real Parties in Interest that the *Myers I* court's adoption of the *Roddis* standard included its definition of indemnity.

38

With respect to Myers's first contention, the court in *Myers I* recognized that *Roddis* arose in a different context than the case before it and acknowledged that financial solvency concerns played a "critical role" in the Supreme Court's determination of *Roddis*, but concluded that it was "a distinction without difference." (*Myers I, supra*, 240 Cal.App.4th at p. 741.) The court explained that, "[i]n *Roddis*, the court's concern over financial solvency stemmed from the fact that CMA had promised to pay for future contingent medical expenses, yet its ultimate liability for such expenses was unknown at the time it collected dues from its covered members. *The same concern supported adoption of the gross premium tax.* According to the Legislative Analyst's Office, the economics of insurance indemnity arrangements—that is, the fact that insurers receive premiums up front, without knowing what related expenses will be paid on those premiums in the future, thereby rendering them unable to determine the net profits attributable to those premiums at the end of the tax year—was the 'key reason' for adopting the gross premium tax." (*Ibid.*, italics added.) We find the *Myers I* court's reasoning persuasive.

Moreover, there is no indication that the *Myers I* court considered the definitions of indemnity and service set forth in *Roddis* dicta when it summarized and quoted *Roddis* at length and adopted the standard it set forth. (*Myers I, supra*, 240 Cal.App.4th at pp. 739–740.) Had the *Myers I* court intended to adopt other definitions of terms that are fundamental to the *Roddis* standard, it presumably would have made that intention clear for the benefit of the parties and the trial court.

Second, although the court in *Myers I* relied on *Metropolitan Life* for the proposition that the court must look

beyond labels and " 'discern the true economic substance' of the arrangement" to determine whether an HSCP is an insurer (*Myers I*, *supra*, 240 Cal.App.4th at p. 741, quoting *Metropolitan Life*, *supra*, 32 Cal.3d at p. 656), we find no basis to conclude that *Metropolitan Life* provides the relevant standard for making that determination.

The issue before the Supreme Court in *Metropolitan Life* was "whether certain amounts, though never formally paid to Metropolitan Life Insurance Company (Metropolitan), nevertheless are to be included within the gross premiums measure of the tax imposed on its business done in California." (*Metropolitan Life*, *supra*, 32 Cal.3d at p. 652.) Metropolitan's "Mini-Met" plan was the subject of the controversy before the court. Prior to Mini-Met, Metropolitan offered employers a standard group policy pursuant to which the employers paid a premium in return for Metropolitan's assumption of the entire obligation to provide health coverage to benefitted employees. (*Ibid*.) To reduce the cost of insurance coverage for employers and to improve their cash-flow situation, Metropolitan developed the Mini-Met rider to the standard group policy, which shifted certain cash-flow advantages to the employers and sought to substantially reduce Metropolitan's GPT liability. (*Id*. at p. 653.) "The Mini-Met rider required employers to assume the obligation to pay all employee claims for benefits up to a 'trigger-point' amount, defined as the actuarially predicted, monthly average level of aggregate employee claims. Metropolitan remained obligated to pay all claims in excess of that amount." (*Ibid*.) For the three tax years in question, Metropolitan argued that it was entitled to a 90 percent reduction in its GPT liability as a consequence of the Mini-Met rider, but the California Insurance

Commissioner levied a tax based upon the sum of the amounts employers paid to Metropolitan as premiums plus the aggregate yearly claims paid to employees from employers' funds. (*Ibid*.) Metropolitan sued for a refund of the tax assessments and interest it had paid the State Board of Equalization and obtained a judgment for the full amount requested, which the Board appealed. (*Id*. at p. 654.)

Ruling in bank, the Supreme Court reversed. (*Metropolitan Life*, *supra*, 32 Cal.3d at p. 662.) The court observed that "insurance necessarily involves two elements: (1) a risk of loss to which one party is subject and a shifting of that risk to another party; and (2) distribution of risk among similarly situated persons. [Citations.]" (*Id*. at p. 654.) The court explained that "[t]he presence or absence of insurance risk on the part of the employers is not alone determinative of Metropolitan's tax liability . . . . In attempting to fulfill the purpose of the gross premiums tax, it is preferable to look beyond the formal labels the parties have affixed to their transactions and seek, rather, to discern the true economic substance of the Mini-Met arrangement." (*Id*. at pp. 656–657.) The court concluded that "the employers under the Mini-Met arrangement functioned not as independent insurers but as 'mere [agents] or [distributors] of funds[,]' " as Metropolitan "determined the amount of all benefits to be paid in satisfaction of employee claims, both above and below the trigger point." (*Id*. at p. 657.) The court concluded that "that there was but one insurer under the Mini-Met package and that the employers functioned as agents of that insurer." (*Id*. at p. 659.)

Thus, *Metropolitan Life* was not a case concerning the classification of HCSPs for regulatory or taxation purposes, nor

41

was there any dispute in that case as to whether Metropolitan was an insurer or subject to the GPT. Further, and more importantly for our purposes, the *Myers I* court stated unequivocally that *Roddis* provides the relevant standard. (*Myers I*, *supra*, 240 Cal.App.4th at p. 740.) The court was clearly aware of *Metropolitan Life* and could have concluded that the presence of the two elements of insurance described in *Metropolitan Life* determined whether an HCSP is an insurer. It did not do so. Indeed, to conclude that the presence of risk of loss and distribution of risk settle the question would not comport with *Metropolitan Life*'s acknowledgment that "[t]he presence or absence of insurance risk" is not determinative of GPT liability (*Metropolitan Life*, *supra*, 32 Cal.3d at pp. 656–657), or with the Supreme Court's observation in *Garrison* that the "[a]bsence or presence of assumption of risk or peril is not the sole test to be applied in determining its status" and that the more important question is "whether looking at the plan of operation as a whole, 'service' rather than 'indemnity' is its principal object and purpose. [Citations.]" (*Garrison, supra*, 28 Cal.2d at p. 809.) Thus, while *Metropolitan Life* is relevant to our analysis, we find no basis to prioritize language in that decision over the standard expressly adopted by the *Myers I* court.

### 1.2.3. Whether the payments made by Real Parties in Interest for in-network services were capitated or non-capitated is not part of the standard adopted in *Myers I.*

Myers further argues that the trial court incorrectly applied the law when it concluded that whether payments made by Real Parties in Interest were capitated or non-capitated was irrelevant under *Roddis*. In *Myers I*, the court recited the

allegations that Blue Shield's and Blue Cross's non-capitated payments exceeded their capitated payments. (*Myers I*, *supra*, 240 Cal.App.4th at p. 730.) The complaint alleged that non-capitated payments were indemnity payments and that capitated payments were not. The *Myers I* court accepted these allegations and concluded that Myers had adequately stated a claim that Blue Cross and Blue Shield should be regarded as "insurers" for purposes of the GPT. (*Id.* at p. 742.) Myers therefore argues that the court in *Myers I* made a legal determination that non-capitated payments constituted indemnity. We again disagree.

Myers fails to explain how we can reconcile the *Myers I* court's explicit adoption of *Roddis* as the relevant standard with a legal conclusion that non-capitated payments constitute indemnity for purposes of determining whether an HCSP is an insurer. The payments CMA made to the 38 physicians in *Roddis* were non-capitated—that is, CMA paid its contracted physicians scheduled fees for services rendered, rather than fixed amounts per member (*Roddis*, *supra*, 68 Cal.2d at pp. 678–679)—and the court concluded that "CMA's contracts with the 38 physicians provide for direct service *without indemnity*[]" because the physicians had agreed not to seek reimbursement from CMA's members. (*Id.* at p. 683, italics added.) If non-capitated payments constituted indemnity under the standard set forth in *Roddis*, the Supreme Court could have concluded that CMA was primarily in the business of indemnity without instructing the trial court to retry the case and determine what proportion of CMA's members was treated by the 38 contracted physicians.

Further, the conclusion that non-capitated payments are indemnity does not follow logically from the *Roddis* standard. The method an HCSP chooses to compensate its healthcare

providers has no bearing on whether its members are at risk of personal liability for medical services. If we accepted Myers's contention that the *Myers I* court made a legal determination that non-capitated payments constitute indemnity because they "effectively spread the financial risk posed by those contingent medical events among the millions of Californians who pay premiums to enroll in Real Parties in Interest's . . . plans," as Myers alleged (*Myers I*, *supra*, 240 Cal.App.4th at p. 739), it would follow that *Myers I* did not actually follow the *Roddis* standard, as it claimed to do. The *Roddis* opinion does not mention risk shifting or spreading, much less state that the spreading of risk is the test for indemnity. Rather, citing *Garrison*, the Supreme Court observed that " '[a]bsence or presence of assumption of risk or peril is not the sole test to be applied in determining its status[,]' " and instead adopted a test in which indemnity was associated with a member's risk of personal liability. (*Roddis*, *supra*, 68 Cal.2d at p. 682.)

Faced with two possible standards, one of which the *Myers I* court expressly adopted and the other which may, at best, be implied by the conclusion it reached based on the allegations of the complaint, which it was required to accept as true (*Myers I*, *supra*, 240 Cal.App.4th at p. 727, fn. 1), we choose the former. We therefore agree with the trial court that whether payments are capitated or non-capitated does not determine whether Real Parties in Interest are insurers.

### 1.3. The law of the case doctrine requires us to apply the *Roddis* standard in this appeal.

Having established our understanding of the standard adopted in *Myers I*, we consider whether we remain bound by that decision. "Under the law of the case doctrine, when an

44

appellate court ' "states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout [the case's] subsequent progress, both in the lower court and upon subsequent appeal . . . ." ' [Citation.] Absent an applicable exception, the doctrine 'requir[es] both trial and appellate courts to follow the rules laid down upon a former appeal whether such rules are right or wrong.' [Citation.] As its name suggests, the doctrine applies only to an appellate court's decision on a question of law; it does not apply to questions of fact. [Citation.]" (*People v. Barragan* (2004) 32 Cal.4th 236, 246.) "The doctrine of law of the case . . . governs later proceedings in the *same case* [citation] with regard to the rights of the *same parties* who were before the court in the prior appeal. [Citations.]" (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 668.) Myers, Blue Cross and Blue Shield do not dispute that the adoption of the *Roddis* standard was necessary to the court's decision in *Myers I*, or that they were parties to the prior appeal.[15] Thus, unless an exception to the law of the case principle applies, we are bound by the legal standard set forth in *Myers I*.

---

[15] Though Health Net and Kaiser are not bound by *Myers I* under the law of the case doctrine because they were not parties in the prior appeal, both argue that the *Roddis* standard should apply. Although we are generally not bound by decisions made by a different panel of this Division (*Tourgeman v. Nelson & Kennard* (2014) 222 Cal.App.4th 1447, 1456, fn. 7), " '[w]e respect stare decisis . . . which serves the important goals of stability in the law and predictability of decision.' " (*People v. The North River Ins. Co.* (2019) 41 Cal.App.5th 443, 455.) Since neither Kaiser nor Health Net advances a " 'good reason to disagree[]' " with the standard adopted in *Myers I* (*ibid.*), we decline to consider whether a different rule of law should apply to those parties.

Exceptions to the law of the case doctrine are limited to two situations: if its application will result in an unjust decision or if the controlling rules of law have changed in the interim. (*People v. Stanley* (1995) 10 Cal.4th 764, 787.) For the "unjust decision" exception to apply, "there must at least be demonstrated a manifest misapplication of existing principles resulting in substantial injustice." (*People v. Shuey* (1975) 13 Cal.3d 835, 846, disapproved on another ground in *People v. Bennett* (1998) 17 Cal.4th 373, 389, fn. 5.) An intervening change in the law exists " 'where the controlling rules of law have been altered or clarified by a decision intervening between the first and the second determinations of the appellate courts.' [Citation.]" (*In re Saldana* (1997) 57 Cal.App.4th 620, 625.) This includes legislative changes or clarifications. (*Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1463 (*Renee J.*).)

Although Myers repeatedly states that *Myers I* is law of the case and thus binding on this court, he argues that this court should follow cases that were not mentioned in the *Myers I* opinion and which conclude that HMOs are insurers for purposes of federal preemption law. He also contends that the *Roddis* standard yields results that are both inconsistent with the purpose underlying the GPT and absurd when applied to other insurers. Notwithstanding the inconsistency of these contentions, we opt to consider whether Myers demonstrates that *Myers I* constitutes "a manifest misapplication of existing principles resulting in substantial injustice" that would permit us to apply another legal standard. (*People v. Shuey*, *supra*, 13 Cal.3d at p. 846.) We further address Blue Cross's and Blue Shield's contention that the 2016 MCO tax constitutes a change in the controlling law that requires us to set *Myers I* aside. We conclude

46

that neither exception applies and that *Myers I* remains law of the case.

### 1.3.1. Cases defining insurance for purposes of federal preemption law do not override the application of the law of the case doctrine.

Myers argues that cases concluding that HMOs are insurers for purposes of federal preemption dictate the conclusion that Real Parties in Interest are insurers subject to the GPT. These cases are inapposite and do not demonstrate that *Myers I*'s adoption of the *Roddis* standard is inconsistent with existing legal principles or substantially unjust.

In *Rush Prudential HMO, Inc. v. Moran* (2002) 536 U.S. 355, 359, the United States Supreme Court considered whether an Illinois statute, which "provides recipients of health coverage by such organizations with a right to independent medical review of certain denials of benefits," was preempted by the Employee Retirement Income Security Act of 1974 (ERISA). "To 'safeguard . . . the establishment, operation, and administration' of employee benefit plans, ERISA . . . contains an express preemption provision that ERISA 'shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan[,]' " but a "saving clause then reclaims a substantial amount of ground with its provision that 'nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.' " (*Id.* at p. 364.) The court adopted a " 'common-sense view of the matter[,]' " under which " 'a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry.' [Citation.]" (*Id.* at pp. 365–366.) This inquiry also "focuses on 'primary elements of an insurance

47

contract[, which] are the spreading and underwriting of a policyholder's risk.' [Citation.]" (*Id.* at p. 366.) The court observed that " '[t]he defining feature of an HMO is receipt of a fixed fee for each patient enrolled under the terms of a contract to provide specified health care if needed.' [Citation.] 'The HMO thus assumes the financial risk of providing the benefits promised: if a participant never gets sick, the HMO keeps the money regardless, and if a participant becomes expensively ill, the HMO is responsible for the treatment . . . .' " (*Id.* at p. 367.) The court concluded that the defendant, an HMO, "cannot checkmate common sense by trying to submerge HMOs' insurance features beneath an exclusive characterization of HMOs as providers of health care" in order to argue that the Illinois law was preempted by ERISA. (*Id.* at p. 370.)

The court also "test[ed] the results of the commonsense enquiry by employing the three factors used to point to insurance laws spared from federal preemption under the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq. [(McCarran-Ferguson Act)]." (*Rush Prudential HMO, Inc. v. Moran*, *supra*, 536 U.S. at p. 366.) "A law regulating insurance for McCarran-Ferguson purposes targets practices or provisions that 'have the effect of transferring or spreading a policyholder's risk; . . . [that are] an integral part of the policy relationship between the insurer and the insured; and [are] limited to entities within the insurance industry.' " (*Id.* at p. 373.) The court concluded that at least the second and third requirements were "clearly satisfied" by the Illinois statute at issue. (*Ibid.*)

In *Smith v. PacifiCare Behavioral Health of California, Inc.* (2001) 93 Cal.App.4th 139 (*Smith*), the issue before the court was "whether a health care service plan may enforce an arbitration

48

clause contained in the plan and in related subscriber agreements which does not comply with the [state] statutory disclosure requirements applicable to such clauses." Specifically, the court considered whether the McCarran-Ferguson Act overrode the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and precluded its preemptive impact on the state statute on the ground that the statute "constitutes a regulation of the business of insurance within the meaning of McCarran-Ferguson." (*Id.* at p. 143.) This Division observed that "HMO's or health care service plans . . . are engaged in providing a service that is a substitute for what previously constituted health *insurance*." (*Id.* at p. 157.) The court concluded that, for purposes of the McCarran-Ferguson Act, the defendant, "PacifiCare, as a health care service plan (or HMO), is engaged in the business of insurance." (*Ibid.*) The *Smith* court noted that "the Legislature has reached the same conclusion in a very public way. It has expressly recognized that health care service plans in California *are engaged in the business of insurance within the meaning of the McCarran-Ferguson Act*[]" by enacting the Managed Health Care Insurance Accountability Act of 1999, Statutes 1999, chapter 536 (Sen. Bill No. 21) section 2, partially codified at Civil Code section 3428. (*Id.* at p. 158.) "In an uncodified section 2 to the act, the Legislature stated: 'SEC. 2. (a) The Legislature finds and declares as follows: [¶] "(1) Based on the fundamental nature of the relationships involved, a health care service plan and all other managed care entities regulated under the Health and Safety Code *are engaged in the business of insurance in this state as that term is defined for purposes of the McCarran-Ferguson Act* . . . . Nothing in this act shall be construed to impose the

49

regulatory requirements of the Insurance Code on health care service plans regulated by the Health and Safety Code." ' " (*Ibid.*)

The *Smith* court rejected PacifiCare's reliance on *Williams v. California Physicians' Service* (1999) 72 Cal.App.4th 722 for the proposition that it was not in the business of insurance for McCarran-Ferguson purposes, noting that *Williams* "did not even address the issue before us. *Williams* simply held that a health care service plan regulated by the Knox-Keene Act was not necessarily the equivalent to an insurance company *for regulatory purposes. Williams* did not purport to address the issue confronting this court. *Rather, it simply recognized that the Legislature has elected to subject insurers and health care service plans to distinct regulatory regimes.*" (*Smith, supra,* 93 Cal.App.4th at pp. 158–159.)

The cases on which Myers relies do not purport to address whether HCSPs are insurers for state taxation purposes and thus do not bear on our determination of whether Real Parties in Interest are insurers for purposes of taxation under California law. "The clear purpose of McCarran-Ferguson was . . . to insure that the states would continue to enjoy broad authority in regulating the dealings between insurers and their policyholders." (*Smith, supra,* 93 Cal.App.4th at p. 153.) This purpose has no relevance to the case before us.

Article XIII, section 28 of the California Constitution defines "insurer" as including, among other things, "insurance companies"—not as any company or association that is "in the business of insurance," the test applied in the ERISA and McCarran-Ferguson contexts. Courts interpreting McCarran-Ferguson have declined to limit its reach to laws specifically concerning insurance companies. (See *Barnett Bank of Marion*

50

*County, N.A. v. Nelson* (1996) 517 U.S. 25, 39–41 [law that permitted banks to act as agents of insurance companies was related to the business of insurance, even if statute did not "relate *predominantly* to insurance" but to banking]; *Gordon v. Ford Motor Credit Co.* (N.D. Cal. 1992) 868 F.Supp. 1191, 1194 [rejecting auto financing company's contention that the McCarran-Ferguson Act exemption should apply only to traditional insurers].) Further, as set forth in *Smith*, it is sufficient for McCarran-Ferguson Act purposes that a company is "engaged in providing a service that is a substitute for what previously constituted health insurance." (*Smith*, *supra*, 93 Cal.App.4th at p. 157.) In contrast, in *Roddis*, the California Supreme Court discussed how "a health plan is similar to insurance in that it purports to cover a future contingency," yet concluded that whether HCSPs were insurers depended on the application of the balancing of its service and indemnity functions. (*Roddis*, *supra,* 68 Cal.2d at p. 681.) In other words, our Supreme Court declined to hold that the mere assumption and transfer of risk, or the fact that insurers and HCSPs fulfill similar functions, rendered HCSPs insurers for regulatory purposes. We see no reason why these similarities would be sufficient to render an HCSP an insurer for tax purposes under California law either.

Further, our Legislature has acknowledged that HCSPs are insurers for purposes of the McCarran-Ferguson Act while making it clear that such interpretation does not render them subject to regulation as insurers for purposes of state law. (*Smith*, *supra*, 93 Cal.App.4th at p. 158.) Just as the court in *Smith* concluded that *Williams v. California Physicians' Service*, *supra*, 72 Cal.App.4th 722 did not provide guidance as to whether

51

an HCSP is in the business of insurance for McCarran-Ferguson purposes because it concerned California regulations, cases holding that HCSPs are insurers for purposes of McCarran-Ferguson and ERISA are not instructive in determining whether Real Parties in Interest are insurers for state taxation purposes. (*Smith,* at pp. 158–159.)

Thus, the *Myers I* court did not misapply existing legal principles under California law when it declined to adopt the assumption of risk as its standard for whether an entity is an insurer.

### 1.3.2. Myers fails to otherwise establish the application of the *Roddis* standard will yield unjust or absurd results.

Myers also argues that the businesses of Real Parties in Interest implicate the key reason for adopting the GPT. Because the *Roddis* standard does not require the court to consider whether HCSPs are able to match their revenues and related expenses, we understand this to be another contention that *Myers I* adopted a standard that is inconsistent with existing legal principles and results in unjust outcomes.

As discussed, the GPT was adopted because it is difficult for traditional insurers to match revenues with related expenses because they "collect their revenues up front [in the form of premiums], then make payments to policyholders based on contingent events that occur many months or years later." (*Myers I, supra*, 240 Cal.App.4th at p. 736, quoting Legis. Analyst, Investment Income and the Insurance Gross Premiums Tax (July 2008) p. 3.) Accordingly, "an accurate determination of the theoretically appropriate amount of taxable income proves very difficult to achieve in practice." (*Ibid.*) Myers contends Real

Parties in Interest do not know the total expenses incurred by members, or their net profits by the end of each year. Myers relies on reports Real Parties in Interest filed with the DMHC, which reflect that Real Parties in Interest had incurred but not reported (INBR) claims and claims payable as of December 31 of each year. Because Real Parties in Interest were unable to fully match revenues and expenses by the end of the year, he argues that their businesses implicate the purpose behind the GPT.

Real Parties in Interest offer several responses to this contention. First, Real Parties in Interest point out the business of HCSPs differs from that of traditional insurers in a fundamental way. A claim for an automobile accident or work injury encompasses all costs associated with that accident or injury and will not close until all costs relating to the triggering event are paid, which results in the possibility that a claim may be open for years or even decades. In contrast, HCSP claims are defined by the individual medical service provided. A claim is incurred when the service is provided and closes when the bill for that specific service is paid, and HCSPs are required by law to pay claims within a short period: 30 working days for PPOs and 45 working days for HMOs. (Health & Saf. Code, § 1371, subd. (a)(1).) Health Net notes that, under its plans, charges for member coverage are paid for services rendered within the period associated with the charge. In other words, a monthly charge to a member is associated with and covers that month of coverage, and thus there can be no significant temporal disconnect between its revenues and expenses.

Kaiser argues that the short delay in pinning down its expenses is an artifact of the accounts payable cycle and is not because it has potential liabilities stretching months or years into

the future. An HCSP may incur expenses late in the calendar year which a provider may not immediately submit, and the HCSP then has another 30 or 45 working days to pay or contest that claim under the Knox-Keene Act. Further, Kaiser notes that the DMHC reports on which Myers relies demonstrate that the vast majority of its revenues and expenses are known with certainty as of the end of the tax year. As an example, in 2014, Kaiser's DMHC reports show that 97.4 percent of its revenues and related expenses occurred and were known as of December 31, 2014—that is, Kaiser's total medical and hospital expenses were approximately $50.6 billion and its claims payable and INBR totaled approximately $1.4 billion.

Similarly, Blue Shield contends that Myers has failed to dispute the trial court's conclusion that the nature of Blue Shield's payment obligations shows the rationale for applying the GPT to insurers does not exist. Blue Shield submitted evidence to the trial court that it pays most claims within 30 days and almost all claims within 90 days. For example, in 2015, Blue Shield paid an average of approximately 77 percent of claims within 30 days of receiving them and paid approximately 97 percent within 90 days. Blue Shield also contends that its INBR claims and claims payable reports establish that Blue Shield can and does match revenues and expenses because they show known costs that have been incurred and will be paid shortly, and thus are comparable to a short-term accounts payable.

Finally, Blue Cross argues that the December 31 cutoff in the DMHC reports on which Myers relies is not pertinent to its business. During the relevant period, Blue Cross submitted its tax returns by the state and federal due date (under extension) of October the following year, by which time it had paid more than

54

99 percent of its claims expenses. For each tax year during the relevant period, Blue Cross was able to and did use its actual claims expenses from January through August of the following tax year for purposes of determining its taxable income for that tax year. Thus, by the time it paid its taxes, Blue Cross knew all but the smallest fraction of its expenses.

Myers's sole response to these varied arguments is that Real Parties in Interest cannot actually identify the bulk of their expenses by the time that they must pay their taxes because "they collectively report billions of dollars in 'Incurred But Not Reported' and 'Unpaid Claims' in their annual statements at the end of each calendar year that attempt to estimate those unknown claim costs." However, Myers makes no attempt to contextualize this figure. As noted, Kaiser's total medical and hospital expenses in 2014 were approximately $50.6 billion. The record indicates that Blue Cross's total medical and hospital expenses for the same year were approximately $9.6 billion, Blue Shield's were approximately $9.5 billion, and Health Net's were approximately $6.4 billion. Thus, the fact that Real Parties in Interest collectively reported billions in INBR and claims payable to the DMHC does not refute their contention that they do not face unknown expenses extending far into the future that are significant in the context of their businesses. We further reject Myers's suggestion that any unknown expenses as of December 31 demonstrates that the logic underlying the GPT applies. We conclude that Myers has failed to identify evidence supporting that the application of *Myers I* would be substantially unjust considering the purpose underlying the GPT's adoption.

Myers also argues that the *Roddis* standard adopted in *Myers I* would yield absurd results if applied to certain types of

insurers. For example, an insured has no personal liability for risks covered by life or disability insurance. Thus, entities providing those types of insurance would be found not to be insurers under the *Roddis* standard. However, as Kaiser points out, *Roddis* did not set forth an all-purpose test for determining whether any entity is an insurer. The *Roddis* court observed that "[h]ealth care service plans were given special legislative treatment because of the direct service feature" and made clear that any workable test to determine whether an HCSP is an insurer must take that function into consideration. (*Roddis*, *supra*, 68 Cal.2d at p. 683.) Insurers that do not have a direct service component to their business have no grounds to argue that this standard applies to them. Accordingly, this argument does not persuade us that the adoption of the *Roddis* standard is absurd or unjust.

### 1.3.3. The 2016 MCO tax does not constitute an intervening change or clarification of law that overrides the law of the case doctrine.

Blue Cross and Blue Shield argue that the 2016 MCO tax constitutes an intervening clarification of the law that overrides the application of the law of the case. They argue that the Legislature could not impose an MCO tax on HCSPs if it understood them to be insurers, which are subject to the GPT in lieu of nearly all other taxes. Thus, even though the HCSPs were not subject to an MCO tax during the relevant periods for this litigation, the 2016 MCO tax demonstrated the Legislature's understanding that HCSPs are not and never were insurers under article XIII, section 28 of the Constitution.

Myers contends that this argument is flawed for two reasons. He argues that the Legislature lacks the authority to

limit a constitutional tax like the GPT. He also contends that the legislative history demonstrates that the Legislature did not enact the 2016 MCO tax or the subsequent 2019 tax with the intent of removing HCSPs from the definition of insurers subject to the GPT.

With respect to the first contention, Myers argues that the Legislature lacks the authority to interpret the definition of insurer because the Supreme Court "perceive[d] no ambiguity either patent or latent in section 28 that would authorize us to look beyond the plain meaning of the words." (*Mutual Life Ins. Co., supra*, 50 Cal.3d at p. 407.)[16]

"[A]n act of the [L]egislature which conflicts with the Constitution is void [citation] . . . ." (*Robison v. Payne* (1937) 20 Cal.App.2d 103, 106.) The constitutional amendment providing for the GPT was originally adopted in 1910 (*Bankers Life Co. v. Richardson* (1923) 192 Cal. 113, 114–116; former Article XIII, § 14, subd. (b)), but was enacted in its current form in 1974, decades after the advent of HCSPs. If the constitutional definition of insurers included HCSPs, the Legislature would lack the authority to exclude them from the GPT. It does not.

Moreover, " '[i]nsurer' " is defined by the Constitution to "*include*[] insurance companies or associations and reciprocal or interinsurance exchanges . . . and the State Compensation Insurance Fund." (Cal. Const., art. XIII, § 28, subd. (a), italics added.) "The term 'includes' is ordinarily a word of enlargement

---

[16] In *Mutual Life*, there was no dispute that Mutual Life Insurance Company of New York was an insurer, only whether it was subject to the GPT when it owned and rented out property and operated a parking lot in California but did not conduct insurance business in the state. (*Mutual Life Ins. Co., supra*, 50 Cal.3d at p. 406.)

and not of limitation." (*People v. Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 639.) "When a word in the California Constitution . . . is capable of several interpretations, a statutory construction of that word is to be afforded substantial deference. [Citation.] This rule of deference arises from the fact that the state Constitution, unlike the federal Constitution, is a limitation on the power of the Legislature rather than a grant of power to it. Any constitutional limitation on legislative power is to be narrowly construed, and a strong presumption of constitutionality supports the Legislature's acts. [Citation.] The Legislature's efforts to interpret a word in the state Constitution are to be upheld 'unless they are disclosed to be unreasonable or clearly inconsistent with the express language or clear import of the Constitution.' [Citation.]" (*People v. 8,000 Punchboard Card Devices* (1983) 142 Cal.App.3d 618, 620–621; cf. *Heckendorn v. City of San Marino* (1986) 42 Cal.3d 481, 488.) The plain language of the GPT provision leaves open the possibility that other entities than those expressly listed may be insurers subject to the GPT. Since the Legislature has the authority to determine what, if any, entities beyond insurance companies, interinsurance exchanges, and the State Compensation Insurance Fund constitute insurers, it follows that the Legislature has the authority to determine that an entity not expressly listed in the constitutional definition is *not* an insurer. Thus, we reject Myers's contention that the Legislature lacks the authority to exclude HCSPs from the definition of "insurers" under the Constitution.

Whether Senate Bill No. X2-2 overrides the application of the law of the case doctrine presents a closer question. The legislative history of Senate Bill No. X2-2 reflects that its purpose was to reform the existing MCO provider tax, which was paid

only by Medi-Cal plans, and replace it with a tax that would be imposed on all HCSPs for a period of three years with the goal of "generat[ing] an amount of nonfederal funds for the Medi-Cal program, equivalent to the sales tax currently imposed on MCPs" and thus "comply[ing] with federal Medicaid requirements." (Former Welf. & Inst. Code, § 14199.50; Sen. Bill No. X2-2, Proposed Conference Report No. 1, Feb. 25, 2016, p. 1.) The 2016 MCO tax would not be collected unless and until DHCS received approval from the federal government that the tax was permissible under federal regulations. (Stats. 2015–2016, 2nd Ex. Sess., ch. 2, pp. 6029–6030.) Thus, although we agree with Blue Cross and Blue Shield that the imposition of the MCO tax on HCSPs is inconsistent with an understanding that HCSPs are insurers subject to the GPT, the history and language of Senate Bill No. X2-2 does not support that its purpose was to address *Myers I* or to clarify that HCSPs are not "insurers" under the Constitution for periods before the MCO tax took effect. We therefore consider whether the 2016 legislation may be understood as a change or clarification of the law that overrides the application of the law of the case doctrine, even if the Legislature did not express this intent.

As our Supreme Court has explained, "[i]t is true that if the courts have not yet finally and conclusively interpreted a statute and are in the process of doing so, a declaration of a later Legislature as to what an earlier Legislature intended is entitled to consideration. [Citation.] But even then, 'a legislative declaration of an existing statute's meaning' is but a factor for a court to consider and 'is neither binding nor conclusive in construing the statute.' [Citations.] This is because the 'Legislature has no authority to interpret a statute. That is a

59

judicial task. The Legislature may define the meaning of statutory language by a present legislative enactment which, subject to constitutional restraints, it may deem retroactive. But it has no legislative authority simply to say what it *did* mean.' " (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 473.)

Contrary to Myers's contention, neither *Roddis* nor *Metropolitan Life* offers a final and conclusive interpretation of the Knox-Keene Act with respect to the issues raised in this appeal, as *Roddis* arose under a prior legislative scheme and did not address taxation issues, and *Metropolitan Life* did not concern HCSPs at all. Nevertheless, *McClung* is instructive. To the extent Senate Bill No. X2-2 addressed the appropriate taxation of HCSPs before July 2016 in light of the Knox-Keene Act, it did so only implicitly. Senate Bill No. X2-2 did not "define the meaning of statutory language by a present legislative enactment"—for example, by enacting language establishing that HCSPs regulated under the Knox-Keene Act are not insurers under article XIII, section 28—or deem any such definition retroactive. (*McClung v. Employment Development Dept.*, *supra*, 34 Cal.4th at p. 473.) Thus, even if we accept that Senate Bill No. X2-2 reflects the Legislature's understanding of what an earlier Legislature intended with respect to the effect of the Knox-Keene Act on the tax treatment of HCSPs, the Legislature's non-binding interpretation of existing law does not appear to constitute a change or clarification of the law that would override the application of the law of the case doctrine.

*Renee J.*, *supra*, 96 Cal.App.4th 1450 provides further guidance. In that case, the appellant argued that the trial court had erred in terminating her reunification services based upon a

Supreme Court decision at an earlier phase of proceedings that interpreted the relevant statute, since the Legislature subsequently amended that statute. (*Id.* at p. 1459.)[17] Quoting *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, the court in *Renee J.* explained that " 'a legislative declaration of an existing statute's meaning is neither binding nor conclusive in construing the statute. Ultimately, the interpretation of a statute is an exercise of the judicial power the Constitution assigns to the courts. [Citations.] Indeed, there is little logic and some incongruity in the notion that one Legislature may speak authoritatively on the intent of an earlier Legislature's enactment when a gulf of decades separates the two bodies. [Citation.] Nevertheless, the Legislature's expressed views on the prior import of its statutes are entitled to due consideration, and we cannot disregard them . . . . [E]ven if the court does not accept the Legislature's assurance that an unmistakable change in the law is merely a "clarification," the declaration of intent may still effectively reflect the Legislature's purpose to achieve a

---

[17] The statute at issue was Welfare and Institutions Code section 361.5, former subdivision (b)(10). (*Renee J.*, *supra*, 96 Cal.App.4th at p. 1455.) The question before the Supreme Court was whether a clause stating that reunification services must be provided if the parent has made a reasonable effort to treat the problems that led to the child's removal was applicable to subpart (A) of former subdivision (b)(10), which stated that reunification services need not be provided where past efforts at reunification proved unsuccessful after removal of another child, and where parental rights to another child have been severed. (*Id.* at pp. 1455–1457.) After the Supreme Court concluded that it was not applicable, the Legislature introduced an amendment that "restructured the clauses of subdivision (b)(10), creating a new subparagraph (b)(11), to clarify that the 'no reasonable effort' clause *did* apply" to subpart (A). (*Id.* at p. 1457.)

retrospective change. [Citation.] Whether a statute should apply retrospectively or only prospectively is, in the first instance, a policy question for the legislative body enacting the statute. [Citation.] Thus, *where a statute provides that it clarifies or declares existing law*, "[i]t is obvious that such a provision is indicative of a legislative intent that the amendment apply to all existing causes of action from the date of its enactment. In accordance with the general rules of statutory construction, we must give effect to this intention unless there is some constitutional objection thereto." [Citations.]' [Citation.]" (*Renee J.,* at pp. 1460–1461, italics added.)

The court in *Renee J.* observed that "the Legislature acted swiftly to clarify an existing law in the wake of court interpretation . . . at the express invitation of the Supreme Court, which declared the prior law to be ambiguous" and that the Senate Rules Committee "explain[ed] that the amendment of the statute [was] necessary merely to rectify a perceived problem with the prior version, and not the product of any desire to take the law in a new direction." (*Renee J.*, *supra*, 96 Cal.App.4th at pp. 1461–1462.) Thus, "it was the intent of the Legislature to give its clarification retroactive effect" and "the Legislature's *clarification* . . . is properly applied to all open cases, including this one." (*Id.* at pp. 1461, 1463.) Accordingly, "the new legislation should have been applied, and properly overrode the effect of the Supreme Court's decision, which would otherwise have been law of the case." (*Id.* at p. 1463.)

Here, unlike in *Renee J.*, the 2016 legislation imposed a new MCO tax on HCSPs for a period of three years and was clearly intended to take the law in a new direction to comply with new federal funding requirements. The statutory language did

not provide or declare that the imposition of the new MCO tax demonstrated its understanding that HCSPs under the Knox-Keene Act are not insurers for any purposes, including in preceding periods, and the legislative history did not discuss *Myers I* or the appropriate taxation of HCSPs when explaining the purpose of the legislation.[18] In the absence of any of the facts that supported overriding the law of the case doctrine in *Renee J.*, we cannot conclude that Senate Bill No. X2-2 effected a change or clarification of the law such that *Myers I* is no longer binding.

Myers also contends that the 2016 tax was one in a series of MCO taxes imposed by the Legislature and thus cannot constitute an intervening change in the law. Although the earlier legislation imposed MCO taxes on Medi-Cal plans and facilities, we agree that this history is relevant. For example, in 2009, the Legislature enacted Assembly Bill No. 1422, which temporarily extended the GPT to Medi-Cal managed care (MCMC) plans on an urgency basis. The Assembly concurrence to Senate amendments to the bill noted that "[m]ost MCMC plans are Knox-Keene licensed health plans[]" and that "Knox-Keene licensed plans do not pay the gross premiums tax." (Concurrence in Senate Amendments of Assem. Bill No. 1422, Sept. 3, 2009, pp. 1–2, 5; Stats. 2009, ch. 157, p. 820.) As of 2009, the Legislature apparently understood that Knox-Keene Act licensed plans were not insurers for any purposes and were generally not subject to the GPT, notwithstanding its imposition of the GPT on certain plans. In 2013, the Legislature passed Senate Bill No. 78,

---

[18] The legislative history refers to *Myers I* and subsequent proceedings in this matter only in the context of discussing litigation related to the legislation, and expresses no opinion about the decision in *Myers I.*

which set a sunset date for the GPT tax and imposed a sales and use tax on MCMCs from 2013 to 2016. (Stats. 2013, ch. 33, pp. 1116–1117; Senate Third Reading of Sen. Bill No. 78 (2013–2014 Reg. Sess.) as amended June 13, 2013, p. 1.) Thus, at the time that *Myers I* was decided, the Legislature had already passed legislation reflecting its understanding—repeated in a 2015 report from the Assembly Public Health and Developmental Services Committee cited by Blue Cross—that Knox-Keene Act licensed plans are not insurers and thus "are not generally prohibited from other taxation." (Assem. Pub. Health & Developmental Services Comm., Informational Hearing: Supporting and Enhancing California's Medi-Cal and Developmental Services Programs (2015–2016 2d Ex. Sess.) July 9, 2015, p. 9.) The 2016 MCO tax did not communicate this understanding in a more direct or explicit manner than the prior legislation, which further undermines the claim that it constitutes an intervening change or clarification of the law.

In support of its arguments, Blue Shield cites a letter printed in the Assembly Daily Journal which stated that, through the 2016 MCO legislation, "the Legislature levied an MCO tax on licensed health care service plans, recognizing that health care service plans are not and have not been insurers as defined by Article XIII, §28 of the California Constitution and California Insurance Code §§ 22 and 23." (Assem. Daily Journal, Sept. 14, 2019, p. 3589.) Myers argues that the letter, written three years after Senate Bill No. X2-2 was signed into law, is not relevant to our determination of the Legislative intent behind the 2016 MCO tax. We agree.

"When construing a statute, our task is to ascertain the intent of the Legislature as a whole. [Citation.] Generally, the

64

motive or understanding of an individual legislator is not properly received as evidence of that collective intent, even if that legislator was the author of the bill in question. [Citation.] Unless an individual legislator's opinions regarding the purpose or meaning of the legislation were expressed in testimony or argument to either a house of the Legislature or one of its committees, there is no assurance that the rest of the Legislature even knew of, much less shared, those views. [Citation.] Moreover, if a legislator's views were never expressed in a legislative forum, those legislators or other interested parties with differing opinions as to the bill's meaning and scope had no opportunity to present their views in rebuttal. [Citation.]" (*McDowell v. Watson* (1997) 59 Cal.App.4th 1155, 1162, fn. 3.) The author of the letter voted on Senate Bill No. X2-2 in 2016 but was not the author of the bill. Even if he had been, his understanding of legislation passed three years prior is not determinative of the understanding of the Legislature as a whole as to the purpose of Senate Bill No. X2-2 absent any evidence that it was shared with the Legislature at that time.

In sum, although the Legislature has the authority to pass legislation stating that Knox-Keene Act licensed plans are not insurers for any purposes, the 2016 MCO tax had the stated purpose of complying with federal funding requirements after the periods relevant to this litigation and contains no express statement that it was intended to be an exercise of that authority. Thus, no intervening clarification of existing law overrides the application of the law of the case doctrine.[19]

---

[19] Blue Cross and Blue Shield assert that, in the absence of a bright line test, HCSPs will continue to face uncertainty as to how they are

### 1.4. Applying the *Roddis* standard to the undisputed facts, Real Parties in Interest are not insurers.

Having concluded that *Roddis* supplies the applicable standard and that we remain bound by the *Myers I* court's adoption of that standard under the law of the case doctrine, we now apply it to the undisputed facts before us.

Pursuant to *Roddis*, we balance the direct service aspects of the businesses of Real Parties in Interest against the indemnity aspects and determine whether indemnity is a significant financial proportion of the business. (*Roddis*, *supra*, 68 Cal.2d at p. 683.) As discussed, indemnity exists where a member bears the risk of personal liability for medical services—i.e., the healthcare provider may seek payment directly from the member for medical services, who must then seek reimbursement from the HCSP. (*Id.* at p. 682.) "On the other hand, there is a strong social policy to encourage the services which health plans provide the public." (*Roddis*, *supra*, 68 Cal.2d at p. 682.) *Roddis* indicates that the direct service offered by HCSPs is the provision of medical services to members for which they are not personally liable. (*Ibid.*)

---

taxed. Considering that Real Parties in Interest have consistently paid over 90 percent of claims costs to in-network providers every year for approximately 10 years and members of their plans (including PPO plans) have strong incentives to seek care from in-network providers, it seems unlikely that the application of the *Roddis* balancing test would yield different results for the parties before us if further litigation arose. In any event, these concerns are best addressed by the Legislature, which may wish to enshrine in law its understanding that Knox-Keene Act licensed plans are not insurers for any purpose and are not subject to the GPT.

Further, although *Myers I* held that an HCSP's regulatory status does not determine whether it is an insurer for tax purposes, we agree with the trial court that the Knox-Keene Act is a relevant consideration when considering the service functions of HCSPs. Health and Safety Code section 1342 demonstrates that the Legislature contemplated that HCSPs would provide various services, including "ensur[ing] the best possible health care for the public at the lowest possible cost by transferring the financial risk of health care from patients to providers." (Health & Saf. Code, § 1342, subd. (d).) The regulatory scheme also imposes additional obligations on HCSPs, such as requiring the establishment and maintenance of provider networks (*id.*, § 1367.03), quality assurance monitoring processes (*id.*, § 1370), and a system for submitting grievances (*id.*, § 1368, subd. (a); Cal. Code Regs., tit. 28, § 1300.68).

As HCSPs licensed under the Knox-Keene Act, the Health and Safety Code requires that the contracts between Real Parties in Interest and their providers state that a plan member will not be liable to the provider for amounts owed for services provided under the plan. (Health & Saf. Code, § 1379, subd. (a).) Even if a provider contract does not include this provision, the contracting provider is barred by law from attempting to collect the amounts owed under the plan from the member. (*Id.*, subd. (b).) Because HCSP members bear no risk of personal liability for in-network care, only out-of-network care provided to members may be equated to "indemnity" under *Roddis* and *Myers I*.

With this legal framework and regulatory background in mind, we turn to the undisputed evidence. We conclude that Real Parties in Interest are not insurers as a matter of law under the relevant standard.

67

### 1.4.1. Blue Cross

Under Blue Cross's HMO and PPO plans, members have access to a network of medical providers, hospitals, and other facilities that have contracted with Blue Cross to provide medical services to Blue Cross members at agreed upon rates. From 2005 through 2016, Blue Cross's contracts with these providers stated that members would not be required to pay providers for amounts owed to that provider by Blue Cross, other than copayments, coinsurance, or deductibles, even if Blue Cross fails to pay the provider. Thus, beyond copayments, coinsurance, or deductibles,[20] a member could never be liable for payments owed by Blue Cross to providers of in-network services. Between 2005 and 2016, between approximately 92 and 97 percent of Blue Cross's claim costs (for both HMO and PPO plans) were for in-network claims, for which providers may only seek payment from Blue Cross. Thus, approximately 3 to 8 percent of its claim costs were indemnity payments for out of network services for which members were liable.

Thus, a far greater proportion of Blue Cross's business was devoted to direct service than to indemnity under *Myers I* and *Roddis*.[21]

---

[20] Myers does not argue on appeal that member cost share payments constitute indemnity.

[21] Because we conclude that Blue Cross is not an insurer under *Myers I*, we do not address its alternative argument that the court should not subject it to retroactive liability under *Myers I*.

### 1.4.2. Blue Shield

Under Blue Shield's HMO plans, members must use contracted providers for nearly all care for the care to be covered under the plan. Although PPO members, unlike HMO members, may choose to obtain services from non-contracted (out-of-network) providers, PPO plans incentivize the use of contracted providers. Blue Shield's provider contracts make clear that "in no event" may providers seek payment from plan members for covered services. Blue Shield's HMO and PPO contracts with members also reflect the prohibition on member financial liability to contracted providers. Even under HMO plans, certain non-contracted providers are prohibited from attempting to collect from plan members, including out-of-network providers of emergency services or services authorized by the plan that cannot be rendered by a contracted provider, and continuity of care services when a contracted provider becomes non-contracted.

During the relevant period of 2005 to June 2016, Blue Shield's direct payments to contracted providers for which its members bore no financial responsibility beyond cost share payments ranged from 94 percent to 97 percent, and averaged 96 percent, of its total payments for members' health care. Blue Shield's expenditures to non-contracted providers over the same period averaged 4 percent. Emergency services and other out-of-network services for which members are not liable are included in the 4 percent, meaning that the proportion of Blue Shield's indemnity is likely lower, though the record does not identify what portion of this figure was for emergency services.

Even if the indemnity payments made by Blue Shield were no lower than approximately 3 to 6 percent during the relevant period, the proportion of Blue Shield's business that constituted

indemnity was not significant in comparison to the portion that comprised direct service.

### 1.4.3. Kaiser

Kaiser does not sell contracts that allow members to seek covered health care services from any provider or hospital of their choice, nor does Kaiser, with limited exceptions, promise to reimburse members for care they receive outside of Kaiser Permanente. During the relevant period, Kaiser members were responsible for copayment, coinsurance, and deductible amounts when they sought medical care from KFH and the Permanente Medical Groups. However, Kaiser's EOCs during the relevant period stated: "Our contracts with Plan Providers provide that you are not liable for any amounts we owe." To the extent that the out-of-network care was in connection with emergency services, Kaiser's contracts with its members provide that members are not responsible for any amounts beyond cost share payments.

Between 2007 and 2016, measured by dollars, approximately 1 to 4 percent of Kaiser's healthcare expenses were paid to noncontracting providers or directly reimbursed to members. For the years 2007 through 2014, measured by discrete visits or consultations, approximately 95 percent of the covered health services provided to Kaiser members were rendered by Kaiser Permanente providers. In 2015, approximately 93.3 percent of the covered health services provided to Kaiser members were rendered by Kaiser Permanente providers, and in 2016, approximately 94.7 percent of the covered health services provided to Kaiser members were rendered by Kaiser Permanente providers.

Even disregarding that some portion of the out-of-network visits and expenses were likely for emergency services for which members are not personally liable, the portion of Kaiser's business that constitutes indemnity was not significant compared to the direct service component.

### 1.4.4. Health Net

During the relevant period, Health Net's EOCs for its commercial HMO plans provided that members must choose a physician group that would provide or authorize all medical care and that members were completely financially responsible for medical care that was not authorized by that physician group, with the exception of emergency medical care. Between 2007 and 2016, Health Net's commercial HMO provider contracts with in-network providers required the provider to agree not to bill or seek compensation or reimbursement from members for contracted services they provided to members, except for copayments, coinsurance, or deductibles.

The annual approximate percentage of Health Net's reported in-network expenses as compared to its total medical expenses for all Health Net product lines for the years 2007 to 2016 was between 96 percent to 99 percent. In the combined period of 2007 through 2016, an average of approximately 98.6 percent of Health Net's reported health care expenses were made to in-network providers as defined by the DMHC. Thus, the portion of Health Net's business that constituted indemnity (between approximately 1 and 4 percent) was not significant.

## 2. The trial court did not abuse its discretion in sustaining the evidentiary objections of Real Parties in Interest.

### 2.1. Standard of Review

Myers asserts that there is a split of authority in California as to the appropriate standard of review of evidentiary rulings. He contends that *Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, which in turn cites *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, supports that the de novo standard should apply. However, in *Reid*, the Supreme Court applied the de novo standard of review to evidentiary objections on which the trial court had failed to rule, reasoning that "because there was no exercise of trial court discretion, the Court of Appeal had no occasion to determine whether the trial court abused it." (*Reid*, at p. 535.) The Supreme Court expressly declined to consider "whether a trial court's rulings on evidentiary objections based on papers alone in summary judgment proceedings are reviewed for abuse of discretion or reviewed de novo." (*Ibid*.) "[T]he weight of authority since *Reid* supports application of the abuse of discretion standard. Cases considering this question and applying the abuse of discretion standard after *Reid* have been published by the First District, Second District, Third District, Fourth District (Division One), Fifth District, and Sixth District— in other words, essentially every district of the appellate courts of the State of California . . . ." (*Doe v. SoftwareONE, Inc.* (2022) 85 Cal.App.5th 98, 103, fn. omitted; *LAOSD Asbestos Cases* (2020) 44 Cal.App.5th 475, 485 ["The weight of authority in this state is that we apply an abuse of discretion standard when we review trial court evidentiary rulings."].)

As courts have observed, "application of the abuse of discretion standard is eminently sensible in light of the practical realities of evidentiary objections in summary judgment proceedings." (*Doe v. SoftwareONE, Inc.*, *supra*, 85 Cal.App.5th at p. 103; cf. *Ducksworth v. Tri-Modal Distrib. Servs.* (2020) 47 Cal.App.5th 532, 544, revd. on other grounds in *Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918.) Given the large number of evidentiary objections that frequently accompany summary judgment motions, "trial courts typically rule on evidentiary objections in summary fashion, which often prevents us from determining the precise nature (i.e., principally legal or factual) of the trial court's ruling. And rulings on evidentiary objections often 'involve trial courts making qualitative and sometimes equitable determinations,' which are the sort of decisions we typically review for abuse of discretion. [Citation.]" (*Doe*, at p. 103; cf. *Ducksworth*, at p. 544 ["Because of the daunting complexity, volume, and pace of [the trial court's] decisionmaking task, the latitude implied by the abuse-of-discretion standard thus does make 'great sense.' [Citation.]"].)

We therefore follow the weight of authority and apply the abuse of discretion standard. Under this standard, "[a]n 'erroneous evidentiary ruling requires reversal only if "there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error." [Citation.]' [Citation." (*Daimler Trucks North America LLC v. Superior Court* (2022) 80 Cal.App.5th 946, 960.)

## 2.2.   The court did not err in sustaining the evidentiary objections of Real Parties in Interest.

The trial court sustained multiple evidentiary objections to the Duncan declarations, primarily on relevance and foundation

grounds. These objections related to statements in the Duncan declarations that Real Parties in Interest employ actuaries and engage in actuarial analyses, make the majority of their payments to providers on a fee-for-service basis, hold reserves and free capital, assume and spread risk, file the same documents as insurers do, and thus that Real Parties in Interest operate as insurers, among others.

As discussed above, the *Roddis* standard does not require a court to consider whether an HCSP engages in risk pooling or spreading, whether its payments to providers are fee-for-service or capitated, or whether it otherwise operates in a manner comparable to insurers. Thus, the trial court did not abuse its discretion in concluding that the portions of the Duncan declarations to which Real Parties in Interest objected were irrelevant.

Evidence that Health Net and Blue Cross received payouts as insurers under the federal Affordable Care Act was also properly excluded. The trial court did not abuse its discretion in concluding that such payments are immaterial, as "the question of whether a law applies to HCSPs as well as insurers depends on the purpose of the law" and is not determined by labels that may apply to Real Parties in Interest in different contexts. This determination is consistent with *Myers I*, which instructed that courts must " 'look beyond the formal labels the parties have affixed to their transactions' " and instead " 'discern the true economic substance' of the arrangement." (*Myers I*, *supra*, 240 Cal.App.4th at p. 741, quoting *Metropolitan Life*, *supra*, 32 Cal.3d at pp. 656–657.) The standard adopted in *Myers I* to determine the true economic substance of an HCSP's business does not

74

require a court to consider whether the HCSP is classified as an insurer by the federal government.

Finally, the trial court did not abuse its discretion when it excluded evidence that PPO plans offered by insurance companies affiliated with Blue Cross and Blue Shield are similar to the PPO plans offered by Blue Cross and Blue Shield and that their websites and actuarial certificates refer to both as insurers. Whether HCSPs and related insurers offer similar plans or fulfill similar functions has no bearing under the *Roddis* standard. Moreover, as discussed, whether Blue Cross and Blue Shield refer to their PPO plans as insurance in certain contexts is a question of labeling, not economic substance, and is therefore of no relevance under *Myers I*.

In sum, the court did not abuse its discretion in excluding evidence that had no bearing on the application of the controlling legal standard. For the same reason, there is no reasonable probability that Myers would have reached a more favorable result had this evidence been admitted.

## DISPOSITION

The judgments are affirmed. Real Parties in Interest shall recover their costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


LAVIN, Acting P.J.

WE CONCUR:


EGERTON, J.


NGUYEN, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.